[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 7, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-16396
Non-Argument Calendar

_____

BIA Nos. A78-616-473 & A78-616-474

LUIS MANUEL GARCIA,
ARMIDA BALCAZAR,

                                                                Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                                Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(September 7, 2005)**

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Luis Manuel Garcia ("Luis") and his wife, Armida Balcazar ("Armida") (collectively "Petitioners"), both proceeding pro se, seek review of the Board of Immigration Appeals' ("BIA's") decision affirming the immigration judge's ("IJ's") order denying their application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT relief"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c).[1]  After reviewing the record, we **DENY** the **PETITION**.

## I. BACKGROUND

Petitioners are natives and citizens of Colombia.  Armida was admitted to the United States on 9 June 1999, and Luis on 26 September 1999, both as non-immigrant visitors.  Armida was authorized to remain until 8 December 1999, and Luis until 25 March 2000.  They remained in the United States beyond these dates and were issued Notices to Appear by the Immigration and Naturalization Service ("INS"),[2]

---

[1]Because the Petitioners' removal proceedings commenced after 1 April 1997, this case is governed by the permanent provisions of the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). See Gonzalez-Oropeza v. United States Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003) (per curiam).

[2]On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2125.  The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department.  However, because this case was initiated while the INS was still in existence, this memorandum refers to the agency as the INS rather than the DHS.

charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as aliens who remained in the United States for a time longer than permitted.

In January of 2001, Petitioners filed an application for asylum, withholding of removal under the INA, and CAT relief. In the application, Luis stated that he was a member of the Salomia neighborhood communal board since August of 1997 and worked in the community for peace of the sector through sports and cultural activities. He organized conferences about democracy and peace in Colombia and tried to reintegrate youth from the guerilla forces into society. He began to receive phone calls telling him to stop his activities or he would have "problems" with the National Liberation Army ("ELN"). Administrative Record ("AR") at 213. The threats occurred with increasing frequency, so he decided to send his wife to the United States in June of 1999. On 13 August 1999, on his way to work, five ELN members beat him and warned him that if he continued his work, they would kill him. A few days later, he was kidnaped by people in a green car, held for two days, and physically and psychologically tortured. His captors warned him to cease his work with the youth or else they would kill him and his family. At that point, Luis decided to leave for the Untied States.

Documentation supporting the application included (1) Luis's and Armida's birth certificates, (2) Luis's and Armida's marriage certificate, (3) a document stating that Armida was a member of the Bread and Peace organization and performed social work with the organization, (4) Luis's academic records, (5) a letter stating that Luis worked for Gatorade, (6) a letter stating that Luis performed community works and taught from August of 1997 to September of 1999, (7) documentation of Luis's participation in the political Becerrista Movement, and (8) documentation of corporate donations to Luis's youth programs. Also included was a police report filed by Luis on 20 September 1999, detailing the 13 August 1999 encounter Luis had on his way to work with five ELN men in a green car who abducted him and physically and psychologically tortured him. The captors told him that because he worked as an activist giving speeches to the community about peace, democracy, and his political position, and was against the guerillas' ideas, he should collaborate with them. He refused to collaborate, and they told him he would be considered a military target, and they would not be responsible for his death. His captors then released him, but he was afraid of leaving his home, did not return to work, and contemplated leaving for the United States. All of this documentation was again included as an exhibit at the asylum hearing.

The 1997 State Department Profile of Asylum Claims and Country Conditions ("Country Profile") indicated that "[t]he vast majority (perhaps as high

4

as 90 percent) of asylum claims from Colombia are based on political grounds even in cases where there is little evidence that the political views of the applicant were related to the mistreatment alleged." Id. at 198.  The ELN was mentioned as a major active guerrilla organization in Colombia.  "[T]hose who refuse to submit to recruitment or extortion [and] those suspected of collaborating with the authorities" were listed as targets of ELN and other groups.  Id. at 199.  The Country Profile stated that "[t]hose fleeing guerrilla or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in the country."  Id. at 200.  The 2001 State Department Country Report on Human Rights Practices in Colombia ("Country Report") stated that the ELN regularly attacked and abused civilians in Colombia.  The ELN was noted as having a strong presence in the departments of Valle del Cauca, Antioquia, Norte de Santader, Bolivar, and Sucre.  However, the Country Report noted that the ELN and other guerilla groups carried out armed actions in 1,000 of Colombia's 1,097 municipalities.  The Country Report indicated that kidnaping continued to be a standing policy and major source of revenue for the ELN, with politicians, cattlemen, children, and businessmen as the preferred victims.  Additional common targets "included local elected officials and candidates for public office, teachers . . . , civic leaders, business owners, and peasants opposed to the guerillas' political or military activities."  Id. at 164.

Also in the record was a copy of Luis's brother's successful asylum application. The IJ did not consider the brother's application because (1) it was not filed in compliance with local rules and (2) "[t]he facts and circumstances as presented by the respondent's brother in that asylum application [are] totally different from the claim being made by the current respondents." Id. at 27-28, 57.

The Petitioners admitted the allegations in the Notices to Appear and conceded removability. At a hearing in August of 2003, Luis testified that he had been a member of the Liberal Colombian Party since April of 1994. He distributed pamphlets for the party's presidential candidate in 1994 and attended campaign meetings. In May of 1999, he began receiving phone calls from the ELN which warned him not to continue speaking to the youth of the Salomia community action board. He received approximately 15 calls in May of 1999, and the calls were answered by him and his parents, with whom he resided. The calls directed him to stop giving talks on the weekends about the history of Colombia to the young people of the neighborhood, which he began doing in April of 1997. Donations from local businesses support the talks. After he began receiving the calls, he became nervous and worried, and because the callers threatened his wife, he decided his wife should go to the United States. He continued to participate in the talks, but on a more sporadic basis, approximately twice a month, and taught fewer students at each talk.

Luis testified that on 13 August 1999, he was intercepted on his way to work by five young men who identified themselves as ELN members. They proceeded to beat him up and advise him to stop his activities with the youth. After the encounter, he continued on to work and did not tell his company about the incident because he feared that he would put the company in danger. He continued to work as usual because he feared losing his job. On 18 August 1999, he was intercepted again on his way to work by five individuals in a car. They blindfolded him, took him to an unknown place, threw him in a room, and told him that they planned to kill him because he had not stopped his activities. They held him for two days and psychologically tortured him by pointing a pistol to his head. He escaped and went to his uncle's house "for many days." Id. at 76. He later decided to report the incident to the authorities, but the police told him they could not provide him protection. At that point, he decided to leave for the United States.

Luis testified that he attempted to apply for asylum in August of 2000 when he was introduced to someone who claimed to work for the INS. The individual told him he would have permanent residency in three months, asked him to sign some forms and get fingerprinted, and collected $2,000. After three months, the individual demanded another $1,000 as part of the price, but Luis refused to pay because he had not seen results. Luis then began searching for other means of becoming a permanent resident and located a lawyer but was unable to afford the

7

fee.  In December of 2000, he went to his church and obtained help in filing his asylum application.

On cross-examination, Luis testified that five of his six brothers, his three sisters, and his parents still live in Cali, Colombia.  The INS attorney questioned Luis about the date of his kidnaping and noted that the police report stated it occurred on 13 August 1999, but he testified that it occurred on 18 August 1999.  Luis responded, "I narrated what happened very quickly because I knew that if I had to go to the prosecutor's office to report it, then I would have to give more details."  Id. at 88  Luis maintained that the kidnaping occurred on 18 August and stated that the discrepancy was "[a] mistake, I don't know, perhaps because of the fear that I felt at that time.  I was going around in fear, so I could have made a mistake."  Id. at 88-89.  He then stated that he was beaten on August 13 and 18, despite his failure to testify to it earlier.  Upon questioning by the IJ, Luis testified that he did not report to the INS that he paid an immigration employee to get his residency because he feared reprisals from the INS.

The IJ denied the Petitioners' application for asylum, withholding of removal, and CAT relief.  The IJ noted that the Petitioners failed to file an asylum application within one year of entering the United States, found that they had not shown that they qualified for an exception to the one-year deadline, and denied asylum due to their untimely filing.  The IJ stated that Luis failed to give a credible

8

explanation on how he continued his youth activism with fewer attendees after receiving the phone calls. The IJ found non-credible Luis's failure to report one of his ELN encounters to his company.] The IJ noted that Luis failed to clarify how he escaped from his kidnapers. The IJ found that the Petitioners failed to show either past persecution or a well-founded fear of persecution and failed to meet their burden of proof that any persecution occurred on a statutory ground. The IJ concluded that the Petitioners failed to show their entitlement for asylum and thus failed to satisfy their burden for withholding of removal, which carried a higher burden of proof. The IJ also found that they failed to establish future persecution on a protected ground. The IJ found that the Petitioners did not show that they would be tortured if returned to Colombia.

The Petitioners filed a notice of appeal to the BIA and argued that Luis was persecuted based on his political opinion by a group the government was unable to control. The Petitioners reiterated their argument in their brief to the BIA. The government did not file a brief. The BIA dismissed the appeal and held that the Petitioners did not meet the burden of proving that the asylum application was filed within one year of their dates of entry or that they qualify for an exception. The BIA also agreed that the Petitioners did not meet their burden of proving eligibility for withholding of removal or CAT relief.

9

## II. DISCUSSION

On appeal, Petitioners argue that Luis has a well-founded fear of future persecution based on his political opinion because he was a volunteer who helped children in the community and will face attacks and death if he returns to Colombia.[3] They contend that Luis suffered past persecution and torture based on threatening phone calls he received. They assert that the persecutors acted in their capacity as government officials to threaten Luis, and internal relocation was not an option.

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. See Al Najjar, 257 F.3d at 1284. Because the BIA issued a decision in this case, we review only that decision.

To the extent that the BIA's decision was based on a legal determination, our review is de novo. See Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). The BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a

---

[3]Although Petitioners note the timeliness of their asylum application as an issue, they do not further argue it in their brief. Therefore, Petitioners have abandoned any timeliness claim by failing to properly argue it before us. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1283 n.12 (11th Cir. 2001) (holding that failure to raise an issue in the initial brief constitutes abandonment of the issue).

whole.'" Al Najjar, 257 F.3d at 1283-84 (citation omitted).  The substantial evidence test is "deferential" and does not allow "re-weigh[ing] the evidence from scratch." Mazariegos v. Office of United States Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001) (quotation omitted).  "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it."  Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (considering withholding of removal claim).

An alien who arrives in or is present in the United States may apply for asylum.  See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  A "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).  The asylum applicant carries the burden of proving statutory "refugee" status. See Al Najjar, 257 F.3d at 1284.  To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear"

11

that the statutorily listed factor will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of such an opinion [or other statutory factor]." Al Najjar, 257 F.3d at 1287 (internal quotations and citation omitted) (emphasis added). An asylum applicant may not show merely that he has a political opinion but that he was persecuted because of that opinion. See INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992).

To qualify for withholding of removal under the INA, an alien must show that it is more likely than not that if returned to his or her country, the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. INA § 241(b)(3); 8 U.S.C. § 1231(b)(3). "An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." Mendoza, 327 F.3d at 1287. For both asylum and withholding of removal, an alien must demonstrate some nexus between the alleged persecution or fear of persecution and one of the five protected grounds. See Perlera-Escobar v. Executive Office for Immigration, 894 F.2d 1292, 1297 (11th Cir. 1990) (per curiam) ("Even a clear probability that an alien's life is threatened without any

12

indication that the basis of the threat is related to a statutorily enumerated ground is insufficient to establish eligibility for relief.").

An alien who has not shown past persecution may still be entitled to asylum or withholding of removal if he can demonstrate a future threat to his life or freedom on a protected ground in his country. 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2).  To establish a well-founded fear, "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289 (discussing well-founded fear as it applies to asylum).  "An imputed political opinion, whether correctly or incorrectly attributed, may constitute a ground for a 'well-founded fear' of political persecution within the meaning of the INA." Id. (citations omitted).  If, however, "an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]." Id. at 1292-93 (internal quotations omitted).

To obtain withholding of removal under the CAT's implementing regulations, an alien must establish that he "more likely than not" will be tortured upon his return to his home country.  8 C.F.R. § 208.16(c)(2). "Torture" is defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has

13

committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Id. § 208.18(a)(1). If petitioners "failed to demonstrate a 'well-founded fear of persecution' sufficient to support an asylum claim, they likewise cannot establish 'torture' sufficient to warrant relief under CAT" because "[t]he burden of proof for an applicant seeking withholding of removal under the Convention, like that for an applicant seeking withholding of removal under the statute, is higher than the burden imposed on an asylum applicant." Al Najjar, 257 F.3d at 1303.

Uncorroborated but credible testimony from the applicant may be sufficient alone to sustain the burden of proof for asylum. 8 C.F.R. §§ 208.13(a), 208.16(b). The weaker the applicant's testimony, however, the greater the need for corroborative evidence. See Matter of Y–B–, 21 I. & N. Dec. 1136, 1139 (BIA 1998). When the IJ enumerates an applicant's inconsistencies and is supported by the record, we "will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004). Additionally, "the IJ's extremely detailed adverse credibility determination alone may be sufficient to support the IJ's denial of [a] petition . . ." Id.

14

As an initial matter, although the IJ found portions of Luis's testimony and explanations incredible, he did not make an overall adverse credibility finding and continued to address the merits. Considering the merits, substantial evidence supports the BIA's decision that the Petitioners were not entitled to withholding of removal. While the treatment to which Luis was subjected may qualify as persecution, the Petitioners have not established a nexus between one of the five protected grounds and the treatment. See Perlera-Escobar, 894 F.2d at 1297. The Petitioners contend that Luis's persecution was on account of his political opinion, but they did not present any evidence to suggest that his attacks were motivated by a political opinion. The conflicts and discrepancies between Luis's testimony and the police report further undermine his testimony, specifically (1) the difference in dates on which the kidnaping incident occurred, (2) the inclusion of only one incident in the police report despite the two encounters allegedly occurring five days apart, and (3) Luis's failure to mention on direct examination the fact that he was physically harmed by his kidnapers. Therefore, the Petitioners failed to establish past persecution on account of a statutory factor.

The Petitioners also did not demonstrate a well-founded fear of future persecution. As discussed above, they have not demonstrated a nexus between Luis's alleged political opinion and the treatment to which he was subjected. Additionally, the fact that several members of Luis's family continue to live in

15

Colombia suggests that Luis's subjective fear of future persecution is not objectively reasonable. See Al Najjar, 257 F.3d at 1289. Thus, the evidence does not compel the finding that the Petitioners have a well-founded fear of future persecution, and they are ineligible for withholding of removal, as they did not establish eligibility for asylum, which carries a lower burden of proof. Al Najjar, 257 F.3d at 1293.

Finally, the Petitioners did not raise CAT relief before the BIA, so, to the extent they raise it in their brief before us, their claim is unexhausted, and we are without jurisdiction to entertain it. See 8 U.S.C. § 1252(d)(1); Fernandez-Bernal v. United States, 257 F.3d 1304, 1317 n.13 (11th Cir. 2001).

### III. CONCLUSION

Petitioners appeal the decision of the BIA affirming the IJ's denial of their asylum petition. Upon a review of the record and upon consideration of the parties' briefs, we discern no reversible error. Accordingly, their **PETITION** is **DENIED.**