Jose Adalberto **PERLERA-ESCOBAR**,
a/k/a Santos Tirso Rodrigues,
Petitioner,

v.

**EXECUTIVE OFFICE FOR IMMIGRATION, and Immigration and Naturalization Service, Respondent.**

No. 89-5064.

United States Court of Appeals,
Eleventh Circuit.

Feb. 20, 1990.

of Justice, Washington, D.C., for respondent.

Before HATCHETT and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Petitioner, Jose Adalberto Perlera–Escobar, appeals the Board of Immigration Appeals' ("BIA") denial of his application for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. §§ 1158(a) and 1253(h) (1982) respectively. The BIA concluded that although Escobar had shown a genuine fear of persecution if returned to El Salvador, that persecution was not on account of a political opinion held by Escobar. Having failed to meet the statutory requirements under section 208(a) and section 101(a)(42) of the Act, Escobar was denied asylum. We affirm the BIA's decision.

## BACKGROUND

Escobar is a twenty-six year old citizen of El Salvador who illegally entered the United States in 1985. In February of 1987, Escobar was convicted and sentenced on two counts of burglary and one count of attempted burglary in the Circuit Court of Gadsden County, Florida. All three convictions were third degree felonies. In March of 1987 the Immigration and Naturalization Service (INS) issued to Escobar an Order to Show Cause why he should not be deported based upon entering the United States without inspection and for having committed a crime involving moral turpitude, namely burglary of a dwelling. At the deportation hearing Escobar admitted the allegations contained in the Order to Show Cause, and was thus deportable under section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2). The hearing was continued to allow Escobar to file an application for asylum. In addition to the application itself, Escobar submitted a statement and

Joan Friedland, American Friends Service Committee, South Miami, for petitioner.

Donald Couvillion, Robert Kendall, Jr., Francesco Isgro, Allen W. Hausman, Office of Immigration Litigation, Civ. Div., Dept.

supplementary information relating to conditions in El Salvador. This information corroborates his statement of ongoing armed conflict between the El Salvadoran government and guerrilla factions. Escobar's statement related his personal history. That personal history may be summarized as follows.

Escobar was born and reared by his grandparents in a small town in El Salvador. Around 1980 the civil war in El Salvador came to Escobar's town, when in response to an increase in guerrilla activity, a paramilitary organization called the Esquadron de la Muerte (Death Squad) arrived. The death squad adopted a practice of extorting money from the townspeople; those refusing to contribute were regarded as collaborators of the guerrillas. Escobar testified that his cousin as well as his stepfather's nephew were killed by the death squads. Escobar's grandparents reported these killings to the local army commander, but he took no action.

Escobar's grandparents and aunt also had problems with a death squad operating out of a nearby town. An agreement was reached between Escobar's grandfather and a member of the death squad whereby Escobar's fourteen year old aunt was given to the squad leader in exchange for a gun, a dog and a woman who was given to Escobar's uncle. A dispute arose over the deal and in February of 1983, members of the death squad attacked and destroyed his grandfather's house, wounding in the process some of Escobar's relatives. Escobar was working in another province on a coffee plantation when this attack occurred; five days after this incident he returned home to find that all the occupants of the house had moved to San Salvador. Escobar then moved in with his mother and stepfather.

Approximately two months later, members of the death squad from the nearby town arrived at his mother's house to buy pigs and discovered that Escobar was related to the family whose house they had attacked two months earlier. During this

encounter, a member of the death squad told Escobar that he would be looking for him in town. Fearing that he would be kidnapped Escobar sought the help of a childhood friend, Reinaldo Menjivar, who he knew to be a guerrilla recruiter. Apparently, Menjivar had tried to recruit Escobar several times, but Escobar refused to join the guerrillas. On this occasion, however, Escobar went with Menjivar to seek refuge. Escobar was taken to a guerrilla camp where, against his will, he was trained and "incorporated" into the guerrilla group. Shortly after Escobar joined, two guerrillas who were suspected of attempting to escape were killed. During the next nine months Escobar fought with the guerrillas against the military. During one operation, the guerrilla group was photographed by journalists. Later, an army plane dropped leaflets over the capital with photos of the guerrillas, including Escobar.

Escobar deserted the guerrillas in February of 1984 after the guerrilla leader denied his request to take leave for a few days. He then went to San Salvador and took a job as a mechanic. Two months after his arrival in the capital, Escobar encountered two guerrillas who informed him that the guerrilla commander had issued orders for his arrest. Escobar also testified that his cousin told him that the death squad in his home town was looking for him. Two weeks later Escobar left the country and resided in Mexico for ten months before illegally entering the United States in February of 1985. Once in the United States Escobar received further information from relatives that the guerrillas and the death squads were looking for him.

Escobar testified that he was politically neutral,[1] but that he would be killed by the military upon arrival in San Salvador because the army knew he was a guerrilla, and that he would be killed by the guerrillas because of his desertion.

## A. *The Immigration Judge's Decision*

The Immigration Judge (IJ) found Escobar to be deportable under sections

---

1. Specifically, Escobar testified that he did not "want to belong into [sic] the guerrilla, nor the

army because I don't believe it's a just cause when fighting against my brothers." (R. 167).

241(a)(2) and 241(a)(4) of the Act; however, he also found that Escobar had established eligibility for asylum and withholding of deportation. The IJ determined that Escobar had demonstrated a well-founded fear of persecution from the government on account of political opinion and membership in a particular social group. The IJ found that Escobar was politically neutral but that both sides in the civil war would attribute a political opinion to him. The government would seek to persecute Escobar because of his perceived political opinion, expressed through his action in joining the guerrillas, and also because of his membership in a particular social group, that is, a person who participated as a guerrilla, albeit unwillingly, and who subsequently abandoned the guerrilla cause. The IJ also found that Escobar had a well-founded fear of the guerrillas. The IJ reasoned that the guerrillas would want to capture Escobar to prevent him from disclosing valuable information about them to the government and that the guerrillas might want to punish him for desertion thereby setting an example to others.

The IJ, however, exercised his discretion to deny asylum to Escobar based on the facts that Escobar had a criminal record in the United States for burglary and attempted burglary, that he used a false social security card and an alias, that he entered without inspection after being granted safe haven in Mexico, and that he failed to apply for asylum until after the INS apprehended him.

Turning to Escobar's application for withholding of deportation, the IJ rejected the INS's contention that he was statutorily ineligible for withholding because his criminal convictions were "particularly serious" crimes. The IJ refused to look behind the convictions [2] when he opined that burglary and attempted burglary were not particularly serious crimes so as to preclude Escobar from consideration for withholding pursuant to section 243(h) of the Act. The IJ found that there was a clear probability that Escobar would be persecut-

ed if returned to El Salvador and granted withholding of deportation. The INS appealed.

## B. *Decision of the Board of Immigration Appeals*

The BIA ruled in favor of the INS by finding that Escobar did not sustain his burden of proving statutory eligibility for asylum or withholding of deportation. Consequently, the BIA did not address the issue of whether Escobar had been convicted for a particularly serious non-political crime.

After an extensive review of the facts, the BIA concluded that Escobar was not eligible for asylum because he had not demonstrated a well-founded fear of the guerrillas on account of his race, religion, nationality, membership in a particular social group, or political opinion. The BIA reasoned that the facts in this case, particularly Escobar's relationship with the guerrillas and his fears based on this relationship, did not support a claim of persecution on account of political opinion. The BIA noted that petitioner admitted he had no political opinion, and that there was no evidence that the guerrillas' motivations to harm him are other than the need to discipline and deter desertion by its members.

The BIA also concluded that if Escobar were arrested by the government of El Salvador, it would not be on account of any political opinion, since Escobar testified he did not have one. Moreover, the BIA found that the government of El Salvador has a legitimate right to seek out Escobar who, as an admitted guerrilla, engaged in active combat against the government. Similarly, if the death squads may target Escobar for retribution, it would not be on account of any political opinion Escobar may have held.

The BIA did not address the issue of whether the petitioner's membership in the guerrilla organization was membership in a particular social group within the purview of sections 101(a)(42), and 243(h) of the Act.

---

**2.** The record indicates that the arrest reports and the information filed in these criminal mat- ters support a higher degree of felony than that for which Escobar was actually convicted.

This issue was neither raised nor briefed before the BIA.

## DISCUSSION

### A. Jurisdiction

Section 106 of the Act, 8 U.S.C. § 1105a, grants us jurisdiction to review directly the BIA's final disposition of Escobar's petitions for asylum and withholding of deportation. *See Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). However, we only decide the issue of whether Escobar's fears of persecution are "on account of ... political opinion" as the term is used in sections 208(a) and 243(h) of the Act. The issue of whether a former guerrilla is a member of a particular social group for purposes of asylum or withholding of deportation was not presented to the BIA. Since Escobar has failed to exhaust his administrative remedies on this question, 8 U.S.C. § 1105a(c), we do not have jurisdiction to decide it. *See Ka Fung Chan v. INS*, 634 F.2d 248 (5th Cir.1981).

### B. Standards of Review

In dismissing his appeal, the BIA determined that Escobar was statutorily ineligible for asylum or withholding of deportation based upon its construction of the phrase "on account of ... political opinion" as it is used in the Act. Neither party contests the facts; the dispute centers on whether those facts show that Escobar had a political opinion on account of which he would be persecuted by the guerrillas, the government, or the death squads. Where the resolution of this matter involves a question of statutory interpretation, we review the BIA's decision *de novo. Desir v. Ilchert*, 840 F.2d 723, 726 (11th Cir.1988). We are also obliged, however, to defer to the BIA's interpretation of the applicable statute if that interpretation is reasonable. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A factual determination by the BIA that an alien is statutorily ineligible for asylum or withholding is reviewed under the substantial evidence test. *Chavarria v. United States Department of Justice*, 722 F.2d 666, 670 (11th Cir. 1984).

### C. Statutory Construction

The meaning and scope of the phrase "on account of ... political opinion" is not defined by the Act, nor does it appear from the legislative history that Congress unambiguously expressed an intent that the term should be construed in a particular way. Therefore, the BIA, pursuant to the powers delegated to it by Congress through the Attorney General, has appropriately engaged in an *ad hoc* interpretation of this undefined term. *See Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–2782. Where Congress has made either an explicit or implicit delegation of authority to an agency to fill the gaps in a statute and to provide meaning to particular terms of a statute, we must give "considerable weight" to the executive department's construction. *Id.* at 844, 104 S.Ct. at 2782. We "may not substitute our own construction for a reasonable interpretation" made by the BIA. *Id.; see also INS v. Cardoza Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221, 1222, 94 L.Ed.2d 434 (1987) ("in the process of filling 'any gap left, implicitly or explicitly, by Congress,' the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program."); *Campos–Guardado v. INS*, 809 F.2d 285, 289 (5th Cir.1987) ("[W]e accord deference to the Board's interpretation of immigration statutes unless there are compelling indications that the Board's interpretation is wrong.").[3] We conclude that the BIA's determination that neither the retribution Escobar fears from the guerrillas for having deserted them nor the investigation

---

**3.** We further note that within the context of reviewing the BIA's denial of a motion to reopen to apply for asylum, the Supreme Court has stated that "INS officials must exercise especially sensitive political functions that implicate questions of foreign relations, and therefore the reasons for giving deference to agency decisions on petitions for reopening or reconsideration in other administrative contexts apply with even greater force in the INS context." *INS v. Abudu*, 485 U.S. 94, 108 S.Ct. 904, 914, 915, 99 L.Ed.2d 90 (1988) (footnote omitted).

that he fears the government will undertake and the punishment it might exact because of his association with the guerrillas constitutes "persecution ... on account of ... political opinion" is reasonable.

■ In reaching its conclusion that Escobar's fear of persecution is not on account of political opinion, the BIA relied upon its construction of the term "political opinion" as it is used in the Act. In a recent line of decisions the BIA has defined a class of threats and harms arising in the context of civil war which do not constitute persecution on account of political opinion. As the documents submitted by Escobar demonstrate, El Salvador is in the midst of a brutal civil war in which the citizens find themselves trapped between two factions, both competing for their loyalties. It is within this context that Escobar fears persecution. The BIA does not dispute that Escobar has a well-founded fear of harm from both sides of the conflict; however, in cases like Escobar's the issue is really "whether the political implications underlying the aliens fear of harm rise to the level of 'political opinion' within the meaning of the statute or whether those conditions constitute the type of civil strife outside the intended reach of the statute." *Campos–Guardado*, 809 F.2d at 290. The BIA takes the position that harm and threats that may incidentally result from behavior meant to achieve a political objective, be it the overthrow of the existing government or, alternatively, the defense of the government against armed insurrection, is not persecution on account of political opinion. *Matter of Rodriguez–Majano*, Interim Decision 3088 (BIA 1988). Even a clear probability that an alien's life is threatened without any indication that the basis of the threat is related to a statutorily enumerated ground is insufficient to establish eligibility for relief. *Hernandez–Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir.1985).

In *Matter of Maldonado–Cruz*, Interim Decision 3041 (BIA 1988), *rev'd*, 883 F.2d 788 (9th Cir.1989), the BIA confronted facts similar to this case. *Maldonado–Cruz* involved a young El Salvadoran male who was forcibly recruited by the guerrillas to fight against the government. Maldonado eventually escaped from the guerrillas and fled the country. In support of his applications for asylum and withholding of deportation, Maldonado claimed that the guerrillas would kill him for deserting them and that the government would persecute him because of its "perceived opinion" that he was a member of the guerrillas. Maldonado further claimed political neutrality.

The BIA denied relief because it presumed the guerrillas' reason for punishing deserters arose from the need to control its members and to exercise discipline—a reason unrelated to any political opinion held by Maldonado. In addition, the BIA determined that the El Salvadoran government's reason for pursuing Maldonado was not on account of political opinion, but on account of the fact that he was a suspected guerrilla. As a suspected enemy of the government, the government had a recognized right to investigate him.[4] Similarly, in *Matter of Vigil*, Interim Decision 3050 (BIA 1988), the BIA stated its position that fear of forced recruitment by either the guerrillas or the government does not constitute fear of persecution "on account of political opinion." In *Matter of Fuentes*, Interim Decision 3065 (BIA 1988), the Board ruled that an applicant's fear from events that occurred when he was a policeman and guard in El Salvador resulted not from his political beliefs but rather from the nature of his employment.

4. Although *Maldonado–Cruz* has been reversed by the Ninth Circuit in *Maldonado–Cruz v. INS*, 883 F.2d 788 (9th Cir.1989), we still regard it as persuasive and as a statement of the BIA's position. In reversing the BIA's decision, the Ninth Circuit relied on its own decisions which hold that political neutrality is a political opinion within the meaning of the Act. This circuit has not adopted the Ninth Circuit's belief that political neutrality is a political opinion for purposes of the Act. Moreover, the Ninth Circuit's determination that the government would persecute Maldonado because it suspected him of being a guerrilla was based on the fact that Maldonado had sufficiently shown that he was dragooned by the guerrillas. In this case the BIA concluded, as do we, that Escobar was not forcibly recruited.

In the context of a civil war, where general conditions of violence exist, it becomes necessary to examine the motivations of the group threatening the alien. *Maldonado–Cruz*, at 7; *Rodriguez–Majano*, at 3. As stated in *Hernandez–Ortiz*,

> [I]n determining whether threats of violence constitute persecution, it is permissible to examine motivations of the persecutor; we may look to political views and actions of the entity or individual responsible for the threats of violence, as well as the victim's, and we may examine the relationship between the two.

777 F.2d at 516.

A finding of persecution requires some degree of intent on the part of the alleged persecutor to harm the applicant in order to overcome a belief of the applicant. *Rodriguez–Majano*, at 3; *Matter of Acosta*, Interim Decision 2986 (BIA 1985) (modified by *Matter of Mogharrabi*, Interim Decision 3028 (BIA 1987). In Escobar's case, the BIA made certain inferences about the motivations of the government and the guerrillas in pursuing Escobar.

### D. *Persecution by the Guerrillas*

█ Escobar fears that the guerrillas will persecute him because he deserted their ranks. The act of desertion, he contends, was an expression of his political neutrality which, he also contends, is a recognized "political opinion" within the meaning of the Act. In the alternative, he argues that the guerrillas will attribute a political opinion to him which they will seek to overcome.

Escobar cites to *Bolanos–Hernandez v. INS*, 767 F.2d 1277 (9th Cir.1985), in which the Ninth Circuit held that a principled position of neutrality will suffice as a "political opinion" under the Act. In the context of a civil war, however, the BIA has declined to apply the principle that a desire to remain neutral is an expression of a political opinion for purposes of asylum and withholding of deportation. *Maldonado* at 11. The BIA's position is no doubt based upon the fact that adoption of such an interpretation would create a sinkhole that would swallow the rule. *See generally*

*Umanzor v. Lambert*, 782 F.2d 1299, 1303 n. 5 (5th Cir.1986). Nonetheless, this case does not require us to decide whether "no opinion" constitutes an opinion under the Act because even assuming that it does, Escobar never openly articulated his position, nor has he shown that the guerrillas pursue him because of his neutrality. *See Arteaga v. INS*, 836 F.2d 1227 (9th Cir. 1988). The record does reflect that Escobar voluntarily joined the guerrillas to achieve a personal benefit and then fought with them for ten months before deserting.

Escobar has also failed to show that the guerrillas have imputed a political opinion to him. In the absence of any evidence that the guerrillas are interested in him for political reasons, the BIA inferred from the record that Escobar is nothing more than a deserter. The record makes it apparent that the guerrillas are a paramilitary organization exercising control and discipline over its members. It is also apparent that the guerrillas often rely on coercion to recruit soldiers who would not otherwise join them. From these facts the BIA inferred that in order to maintain order and promote loyalty from its members, the guerrillas must discipline deserters. Without such measures the guerrillas would perish when, as is inevitably the case, the spirit of its fighters wanes. In this respect the guerrillas are similar to any military organization that punishes deserters in order to maintain unity. Moreover, the guerrillas also have an interest in preventing Escobar from divulging their secrets to the government or government-backed groups. Even Escobar admits that the guerrillas are interested in him because of what he knows. Simply, the guerrillas care not what Escobar thinks or believes; rather their interest in him stems from their need to preserve unity and order in their ranks and to ensure the secrecy of their operations.

The BIA's determination that the need to discipline and silence deserters is not persecution on account of "political opinion" within the meaning of the Act is reasonable. We also believe that the Board's inference about the motives of the guer-

rillas is supported by the record.[5] Although other inferences about the guerrillas' motives may be drawn, it is not our task to do so as long as substantial evidence supports the BIA's conclusion. By holding in this case that Escobar's fears of the guerrillas are not on account of political opinion, we do not categorically hold that a former guerrilla may never show persecution "on account of ... political opinion." We do not deny the possibility that a former guerrilla can demonstrate, through evidence in the record, that the guerrillas pursue him to overcome a recognized political opinion. This, however, is not that case.

### E. *Persecution by the Government and Death Squads*

Escobar also contends that apart from any threat from the guerrillas, the government and the death squads will persecute him as a result of his association with the guerrillas. The BIA rejected this argument because it concluded that the government's motivation for investigating and possibly punishing Escobar was not on account of a political opinion, but on account of the fact that Escobar had fought against the government in the civil conflict. The BIA found nothing in the record to indicate that the government of El Salvador is anything other than a duly established government. As such it has the internationally recognized right to defend itself against attack and rebellion. Escobar admits to fighting against the government, therefore, we agree with the BIA that the government may legitimately investigate him and punish him accordingly should it find that he is indeed a traitor. The government will not harm him because

of political opinion, but rather because he is or was an opponent of the government.

Again, the fact that the government and the guerrillas are fighting to achieve political objectives does not imbue every act committed by them with political significance. Escobar may well fear persecution on account of what he believes to be political opinion. However, in the context of civil war where fear permeates the life of every citizen, the motivation of the persecutor becomes the linchpin of the analysis. Here, where Escobar has not shown that he will be persecuted by the government or death squads on account of political opinion, the BIA reasonably inferred that the government's motivation was prosecutorial rather than persecutorial.

## CONCLUSION

What constitutes a political opinion under the Act is a political question which the courts are not especially qualified to decide. Accordingly, we accord a presumption of correctness to the BIA's conclusion that Escobar's fear of persecution by the government and death squads for fighting with the guerrillas or by the guerrillas for being a deserter is not "on account of political opinion." Moreover, we hold that the record supports the BIA's inferences as to the motivations of those parties seeking Escobar.

The ruling of the BIA is AFFIRMED.

---

5. Escobar argues that the BIA's inferences as to the motives of the guerrillas and the government eliminates the reasonable person standard from the question of "persecution on account of political opinion." In *Matter of Mogharrabi,* at 9, the BIA stated that an applicant for asylum establishes a well-founded fear of persecution if "he shows that a reasonable person in his circumstances would fear persecution" on account of one of the grounds specified in the Act. Escobar contends that in his case, the BIA has substituted presumptions as to the motives of the persecutor and the nature of the persecution

in place of a case-by-case analysis. This argument confuses the issue. The question here is not that Escobar has a reasonable fear of persecution but whether he has demonstrated that that fear is on account of a "political opinion" as that term has been interpreted by the BIA. Moreover, to adopt Escobar's position would allow the applicant to determine the scope of the term "political opinion" and, therefore, would entitle almost anyone in a war torn country to meet the statutory requirements for a grant of asylum.