[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13489
_____

Agency No. A212-911-751

KAROOSHAN LINGESWARAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals
_____

(August 13, 2020)

Before WILSON, BRANCH, and JULIE CARNES, Circuit Judges.

BRANCH, Circuit Judge:

Karooshan Lingeswaran is a 26-year-old native and citizen of Sri Lanka. On February 8, 2017, the United States Coast Guard interdicted Lingeswaran approximately 12.5 nautical miles east of Miami, Florida, as he tried to enter the United States illegally. Thereafter, the Department of Homeland Security ("DHS") commenced removal proceedings, charging him with inadmissibility under 8 U.S.C. § 1182(a)(7)(A)(i)(I),[1] which Lingeswaran conceded. Lingeswaran applied for asylum and withholding of removal pursuant to the Immigration and Nationality Act ("INA"), and withholding of removal pursuant to Article 3 of the United Nations Convention Against Torture ("CAT"),[2] expressing a fear of persecution if he returned to Sri Lanka. The INA requires an alien seeking asylum to establish that he was persecuted "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A).[3] To be eligible for relief pursuant to CAT, an

---

[1] That provision states that "any immigrant at the time of application for admission . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title. . . is inadmissible." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

[2] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, § 1, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85.

[3] Section 1158(b)(1)(A) states: "The Secretary of Homeland Security or the Attorney General *may grant asylum* to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien *is a refugee within the meaning of section 1101(a)(42)(A).*" (emphasis

applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.16(c)(2).[4] In order to meet the definition of torture, the harm must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a).

The Board of Immigration Appeals ("BIA") denied his application for asylum and withholding of removal under the INA and withholding of removal under CAT and ordered him removed from the United States.  We deny the petition.

## I.

A. Background[5]

Lingeswaran is an ethnic Tamil from the Jaffna area of Sri Lanka.  From the time he was born in 1993 until shortly before his departure from Sri Lanka in May 2010, the country was engulfed in a civil war between the Liberation Tigers of

---

added).  Section 1101(a)(42)(A), in turn, defines the word "refugee" as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

[4] In full, § 208.16(c)(2) provides that "[t]he burden of proof is on the applicant for withholding of removal under this paragraph to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."

[5] In presenting the background information in this section, we rely on the statements made by Lingeswaran in his asylum application, credible fear interview, and removal hearing.

Tamil Eelam ("LTTE" or "Tamil Tigers") and the Sri Lankan government.[6]  To say that the Sri Lankan civil war greatly impacted Lingeswaran's life is an understatement.  In 1995 (when Lingeswaran was two years old), the Sri Lankan army abducted and tortured his father for five days due to suspicion that he assisted the LTTE by deploying a bomb near his mechanic shop.  Terrified, the family relocated to Mullaitivu, an area controlled by the LTTE.  His father repaired cars and paid the LTTE monthly dues.  Lingeswaran and his brother attended the LTTE-controlled school.  Students at the school were expected to join a student group which participated in various events celebrating the LTTE.  For example, on November 27 every year, the student group would place tents and flags along the road and put on plays to honor the revolutionary group.  As class president, Lingeswaran organized and participated in the celebratory events and rallies.

Fourteen years after Lingeswaran's family relocated, on May 17, 2009, the Sri Lankan army captured the Mullaitivu area.  Lingeswaran and his family surrendered, along with thousands of other Tamils, and the army took them to a refugee camp.  Before entering the camp, the Sri Lankan army identified Lingeswaran's father as an LTTE member and dragged him away.  Lingeswaran never saw his father again.

---

[6] In 1997, the United States Secretary of State designated the LTTE as a foreign terrorist organization pursuant to 8 U.S.C. § 1189(a)(1), (d)(4).  *See* 62 Fed. Reg. 52650.

In October 2009, the Sri Lankan army brought Lingeswaran to the nearby army camp for an "investigation." The army accused Lingeswaran of LTTE involvement and, for about twenty minutes during the hour-long interrogation, beat Lingeswaran with their hands and a rope.[7] Lingeswaran denied any LTTE involvement and they released him. Sometime after that interrogation, the Sri Lankan army again took Lingeswaran in for questioning and accused him of helping his aunt's family (who were LTTE members) escape from the camp. The second interrogation lasted roughly 15 minutes, during which the army members hit and kicked Lingeswaran and put a gun to his head. Afterwards, they put him in line with approximately 50 other Tamils to be taken to Boossa—a location where people were known to be tortured. Just then, a human rights organization arrived. That arrival prompted the army to tell those in line, including Lingeswaran, to return to the camp and that they would take them to Boossa later.

In November 2009, Lingeswaran escaped from the camp and made his way to Colombo, Sri Lanka. He left Sri Lanka in May 2010 and travelled to France. While in France, he applied for asylum, received 300 euros a month in benefits from the French government, and worked in a store. According to Lingeswaran,

---

[7] In his application, Lingeswaran said that the interrogators hit him with a rope. But he initially testified in the merits hearing that they only hit him with their hands. He added that the army also hit him with a rope only after his attorney reminded him that his asylum application reflected that he was hit with a rope. The IJ noted this conflicting account as one of a few discrepancies between Lingeswaran's application and testimony.

5

he failed to appear for an immigration interview because he planned to come to the United States, and his application for asylum in France was denied.  He then left France and made his way to the United States by way of the Bahamas, using a passport given to him by an "agent" arranging his travel.

Meanwhile, in June 2010, Lingeswaran's mother and brother fled to India. They returned to Sri Lanka in April 2015.  Upon their arrival, the Sri Lankan government forces arrested Lingeswaran's brother and tortured him for one week. The army released him, but told him that until Lingeswaran returned, he would have to check in with the army every month.  They also told his brother that Lingeswaran's name was on a list at the airport and Lingeswaran would be arrested and killed if he came back.

## B. Immigration Court and BIA Proceedings

The Immigration Judge ("IJ") denied Lingeswaran's claims and ordered his removal to Sri Lanka.  With regard to his asylum claim, the IJ found that the evidence showed that the Sri Lankan army interrogated Lingeswaran on account of his possible involvement with a terrorist organization and not on account of a protected ground.  Moreover, the IJ concluded that the Sri Lankan army's treatment of Lingeswaran did not rise to the level of persecution.  The IJ further found that Lingeswaran did not show that he had a well-founded fear of persecution if he returned because the Sri Lankan civil war ended in 2009 and his

6

family appeared to be living there safely now.  And because Lingeswaran had not shown a well-founded fear of persecution that qualified for asylum, he also necessarily fell short of carrying his burden for the higher standard required for withholding of removal.  The IJ concluded that Lingeswaran's CAT claim failed because "there [wa]s no objective evidence in the file" that the Sri Lankan government would specifically target him.  Rather, the evidence showed that the Sri Lankan government was "trying to take every measure that they can to get the country back on track" and no longer supported the mistreatment of Tamils.

Lingeswaran appealed to the BIA.  The BIA agreed with the IJ's decision regarding Lingeswaran's CAT claim and with the IJ's determinations on the issues of past persecution and well-founded fear of being singled out for persecution underlying Lingeswaran's asylum claim.  But the BIA held that remand was necessary because the IJ had failed to consider the remaining issue underlying Lingeswaran's asylum claim: whether Lingeswaran had established a well-founded fear of future persecution based on a pattern or practice of persecuting Tamils.

On remand, the IJ determined that there was not a pattern or practice of persecution of Tamils in Sri Lanka.[8]  The IJ observed that the country background materials submitted by the parties showed that Tamils face discrimination and

---

[8] The IJ incorporated his 2017 decision and noted that he had considered the admitted evidence in its entirety.

7

harassment in Sri Lanka.  But although the Sri Lankan government "has been slow to implement change," the IJ found that "the government has continued to improve the situation for Tamils since the war ended in 2009."  The IJ emphasized that the Sri Lankan government has established the "Office of National Unity and Reconciliation" to protect the rights of all citizens and heal communities affected by the war.  Further, the IJ noted that "the Sri Lankan Prime Minister [publicly] stated that Sri Lanka will not prosecute Sri Lankan asylum seekers who left the country illegally."  The IJ observed, "[i]f the Sri Lankan government is not prosecuting returning asylum seekers and is not imputing those returning to Sri Lanka to be LTTE members, this evidence makes it less likely that the government is persecuting Tamils."  Accordingly, the IJ found that Lingeswaran did not qualify for asylum.

On appeal, the BIA sympathized with Lingeswaran: "We have no wish to minimize the suffering of ethnic Tamils in Sri Lanka, and we understand why the respondent does not wish to return to that country."[9]  But it upheld the IJ's decision because the IJ's factual findings did not reveal that "the mistreatment of ethnic Tamils in Sri Lanka is [] so extreme and pervasive as to establish a 'pattern or practice' of persecution, such that we can say all Tamils qualify for asylum and

---

[9] As an initial matter, the BIA noted that its prior decision affirming the IJ's denial of CAT protection and asylum insofar as Lingeswaran claimed an individualized fear of persecution was the law of the case; thus, the BIA would not "revisit" those determinations.

8

withholding of removal in the United States, whether or not they have a particularized fear of persecution." This petition for review followed.

## II.

We review the BIA's legal conclusions *de novo*. *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 817 (11th Cir. 2004). Its factual findings, however, "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We therefore review the BIA's findings of fact under the "highly deferential substantial evidence test." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*). That test requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* In other words, we must affirm the BIA's factual findings so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001) (quoting *Lorisme v. INS*, 129 F.3d 1441, 1444–45 (11th Cir. 1997)). When "the record could support or contradict the conclusion of the BIA, we must affirm its decision." *Recinos v. U.S. Att'y Gen.*, 566 F.3d 965, 967 (11th Cir. 2009).

## III.

A. Asylum

9

On appeal, Lingeswaran argues the BIA erred in rejecting his claims for asylum pursuant to 8 U.S.C. § 1101(a)(42)(A).  The INA gives the Attorney General discretion to grant asylum to eligible applicants.  8 U.S.C. 1101(a)(42)(A); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987) ("[T]he Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee.") (emphasis in original); *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230–31 (11th Cir. 2005) ("If he or she meets [their] burden, the actual grant of asylum is a matter of discretion.").  To establish asylum eligibility, the applicant must, with credible evidence, establish (1) he was persecuted in the *past* "on account of race, religion, nationality, membership in a particular social group, or political opinion" (together, "protected grounds"), or (2) he has a "well-founded fear" of persecution in the *future* "on account of" any of his protected grounds.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); 8 C.F.R. § 208.13(a), (b).  According to Lingeswaran, he is eligible for asylum through either avenue.  Taking each argument in turn, we conclude that Lingeswaran is not eligible for asylum.[10]

---

[10] Although Lingeswaran submits various arguments to as to why the BIA erred in denying his asylum claim, he does not appear to challenge specifically the BIA's rejection of his related withholding of removal claim.  But to the extent he also contests that decision, it also fails.  Similar to an asylum claim, an applicant for withholding of removal must show that his life or freedom would be threatened because of a protected ground.  8 U.S.C. §§ 1231(b)(3)(A),(C), 1158(b)(1)(B).  But the burden on the applicant for withholding of removal is higher: he must establish a "clear probability" of persecution on account of a protected ground.  *INS v. Stevic*, 467 U.S. 407, 430 (1984).  Because we hold that Lingeswaran cannot meet the lower burden for asylum relief pursuant to 8 U.S.C. § 1101(a)(42)(A), he necessarily cannot meet the burden for withholding of removal relief pursuant to § 1231(b)(3).

1. Past Persecution

We first address Lingeswaran's argument that the BIA committed legal error by failing to consider whether the Sri Lankan army had multiple motivations in persecuting him, including his Tamil ethnicity[11] or his imputed political opinion, *i.e.*, support of the LTTE.  Along those same lines, he asserts that the BIA wrongly concluded that Lingeswaran was not persecuted on account of a protected ground.[12]

The BIA engaged in the proper analysis in determining whether Lingeswaran was persecuted on account of a protected ground.  Because an applicant's protected trait "need not be the *only* motivation for the persecution," *Sanches-Jimenez v. U.S. Att'y Gen.,* 492 F.3d 1223, 1232 (11th Cir. 2007), where

---

*See Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) ("An alien who fails to establish that he has a well-founded fear of persecution necessarily fails to establish eligibility for withholding of removal.").

[11] The asylum statute provides a list of five protected grounds: "race, religion, nationality, membership in a particular social group, [and] political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1).  In seeking asylum, Lingeswaran claims that his "Tamil nationality/ethnicity/race" is a protected ground.  We need not decide whether his Tamil ethnicity is, in fact, a statutorily protected ground, however, because the government has not raised this issue and because we affirm the BIA for other reasons.

[12] Lingeswaran relatedly claims that the IJ erred in finding that the Sri Lankan army's treatment of him did not amount to persecution.  We cannot address this argument because the BIA did not adopt this finding in its decision and therefore it "does not form any part of the order currently under review." *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007).  Rather, the BIA affirmed the IJ's denial of asylum based only on its conclusion that Lingeswaran's ethnicity or imputed political opinion was not one central reason for his alleged harm.

11

multiple motivations are at a play, the BIA must determine whether a protected ground "was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i).

Here is how the BIA addressed Lingeswaran's claim that he was persecuted on account of a protected trait:

> With respect to the issue of past persecution, the respondent testified that he was detained and beaten by the Sri Lankan military because they believed that he was a member of the LTTE. However, we find no clear error in the Immigration Judge's finding that the respondent's ethnicity or imputed political opinion was not one central reason for his alleged harm. Instead, the Immigration Judge properly found that the respondent's alleged harm was part of an investigation that occurred in the midst of a civil war.

We thus turn to the IJ's reasoning. *See Najjar*, 257 F.3d at 1284. The IJ also considered whether Lingeswaran was persecuted on account of his ethnicity or imputed political opinion:

> Respondent was I believe, if I am not mistaken, detained by the military on two separate occasions. This was during the time of the war between the Tamil Tigers and the Sinhalese majority, the Sri Lankan army. And he was questioned not because they wanted to punish him because of his race or his religion or nationality, membership in a particular social group or political opinion, but rather because of their belief that he may have been associated with a terrorist organization, the LTTE Tigers, so I don't see a connection to a protected ground.

Thus, both the IJ and the BIA explicitly considered whether Lingeswaran's ethnicity or political opinion could have played a role in his alleged persecution. We therefore find no legal error.[13]

Nor does anything in the record compel us to overturn the BIA's factual finding that Lingeswaran was not persecuted on account of a protected ground. An asylum applicant has the burden to establish that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). Here, the record supports the BIA's conclusion that the Sri Lankan army's alleged treatment of Lingeswaran was not on account of a protected ground, but rather his possible involvement with a terrorist organization.

We have explained that "[t]he fact that the government and [a revolutionary group] are fighting to achieve political objectives does not imbue every act committed by them with political significance." *Perlera-Escobar v. Exec. Office*

---

[13] Relatedly, Lingeswaran objects that the BIA failed to consider his asylum claim "cumulatively on account of being a Tamil, failed asylum seeker, and a family member of a LTTE member." More specifically, he claims that the BIA failed to consider his failed asylum seeker status at all. Contrary to Lingeswaran's assertion, the IJ's findings, which the BIA accepted, included the finding that the Sri Lankan government is not prosecuting failed asylum seekers. As to Lingeswaran's argument that the BIA should have considered all of his asserted protected grounds cumulatively, he does not rely on any precedent requiring the BIA to engage in a "cumulative analysis," and we are not aware of any. Rather, the BIA properly considered whether one of the asserted protected grounds was "at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). Therefore, the BIA did not legally err by not engaging in a "cumulative analysis."

*for Immigration*, 894 F.2d 1292, 1299 (11th Cir. 1990). And the BIA has interpreted the meaning and scope of the phrase "persecution . . . on account of . . . political opinion" to exclude "harm and threats that may incidentally result from behavior meant to achieve a political objective, be it the overthrow of the existing government or, alternatively, the defense of the government against armed insurrection." *Id.* at 1297 (citing *Matter of Rodriguez-Majano*, 19 I. & N. Dec. 811 (BIA 1988)). Thus, a "duly established government" such as the government of Sri Lanka, "has the internationally recognized right to defend itself against attack and rebellion." *Id.* This right encompasses investigations of suspected terrorists. *Id.* Therefore, "in the context of civil war where fear permeates the life of every citizen, the motivation of the persecutor becomes the linchpin of the analysis." *Id.* "Statements of perpetrators are a crucial factor to be considered in determining motive." *In re S-P-*, 21 I. & N. Dec. 486, 494 (BIA 1996). But "[w]hat constitutes a political opinion under the [INA] is a political question which the courts are not especially qualified to decide." *Perlera-Escobar*, 894 F.2d at 1299. We therefore "accord a presumption of correctness to the BIA's conclusion" that the Sri Lankan government's interrogation of Lingeswaran was not on account of political opinion. *Id.* With that presumption in mind, we turn to the record.

The record does not compel us to find that Lingeswaran was persecuted on account of an imputed political opinion. Again, the motivation of the alleged

14

persecutors is key to this inquiry. *Id.* The record shows that suspicion that Lingeswaran was involved with terrorist activity motivated the Sri Lankan army. The LTTE, a recognized terrorist organization, had attacked and rebelled against the Sri Lankan government for decades. Lingeswaran testified that he lived in an area of Sri Lanka controlled by the LTTE and organized events celebrating the LTTE. His father paid LTTE dues and had been arrested previously for suspected terrorist activities. Others in Lingeswaran's family were LTTE members. In this context, where the Sri Lanka government and the LTTE had been engaged in a decades-long war and Lingeswaran had multiple links to that group, any alleged harm Lingeswaran suffered was "not because of political opinion," but rather because he may have been "an opponent of the government." *Id.* Thus, the record supports the BIA's finding that the Sri Lankan army interrogated him on account of possible terrorist involvement.

Nor is there evidence in the record that compels us to find that the Sri Lankan military targeted Lingeswaran on account of his Tamil ethnicity, as opposed to its concern that he was a member of a terrorist group that opposed the government. Lingeswaran testified that during the civil war between the Sri Lankan government and the LTTE, the Sri Lankan army only arrested and attacked Tamils. For sure, as its name implies, the Liberation Tigers of Tamil Eelam, also known as the "Tamil Tigers," was composed of ethnic Tamils. Yet, that evidence,

15

by itself, does not prove that the military was arresting people on account of their

ethnicity rather than their involvement with a terrorist organization.  Indeed, as to

his interrogation while living in the Tamil refugee camp, Lingeswaran

acknowledged that this interrogation was part of a broader investigation into his

connections to the Tamil Tigers.  That is, he noted that his interrogators "asked

[him] whether [he] went for training with the Liberation Tigers," said they "had

information that [he] was involved" with the group, and "wanted to know [about

his] aunt's involvement with the Liberation Tigers" and "where [she] went" when

she escaped from the camp.  This evidence further supports the BIA's conclusion

that Lingeswaran was targeted as "part of an investigation that occurred in the

midst of a civil war," not based on his ethnicity.  In fact, Lingeswaran has not

alleged that any member of the Sri Lankan army made any statement indicating

that they were harming him because he was Tamil.  To the contrary, according to

Lingeswaran's own testimony, they repeatedly voiced their concern that he was a

member of the LTTE.  Accordingly, the record supports the BIA's conclusion that

Lingeswaran was not persecuted on account of a protected ground.[14]

---

[14] On appeal, Lingeswaran faults the IJ for failing to engage in a "complex and contextual" analysis into Sri Lanka's country conditions in concluding that he was not persecuted on account of his political opinion.  He also argues that he was persecuted on account of an imputed political opinion because he was interrogated extrajudicially.  But Lingeswaran did not present these arguments on appeal to the BIA.  We cannot review a final order of removal where the petitioner has failed to "exhaust [ ] all administrative remedies available to [him] as of right." 8 U.S.C. § 1252(d)(1). "When a petitioner has neglected to assert an error before the BIA that he later attempts to raise before us, the petitioner has failed to exhaust his

16

2.  Well-Founded Fear of Future Persecution

Turning to Lingeswaran's second purported basis for asylum, he contends that he has a well-founded fear that the Sri Lankan government will persecute him in the future if he returns.  Even where an applicant has not suffered past persecution, he may still qualify for asylum based on his fear of persecution upon his return.  An applicant can establish that he has a well-founded fear of future persecution by either (1) presenting "'specific, detailed facts showing a good reason to fear that he . . . will be *singled out* for persecution' on account of such a[] [protected basis]," *Najjar*, 257 F.3d at 1287 (quoting *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994)), or (2) showing "that he is a member of, or identified with, a group that is subjected to a pattern or practice of discrimination." *Djonda*, 514 F.3d at 1174; *see also* 8 C.F.R. § 208.16(b)(2).  Either way, the applicant's fear of persecution must be "subjectively genuine and objectively reasonable."  *Sepulveda*, 401 F.3d 1226, 1231 (11th Cir. 2005) (quoting *Najjar*, 257 F.3d at 1289).  The BIA concluded that Lingeswaran's fear was not objectively reasonable because he did not show that the Sri Lankan government would target him or that the Sri Lankan government routinely persecutes Tamils.  Substantial evidence supports that finding.

---

administrative remedies." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016). Thus, we cannot review these specific objections.

17

a. Individualized Risk of Persecution

Lingeswaran argues that he will be targeted for persecution because the Sri Lankan army detained and tortured his brother and instructed him to check in weekly at the army camp until Lingeswaran returned. He also claims that in 2015, the army warned his brother that Lingeswaran's name was on a list at the airport and the army would arrest and kill him as soon as he returned.

The BIA considered Lingeswaran's brother's experience: it observed that "[a]lthough [Lingeswaran's] brother was arrested upon returning to Sri Lanka [in 2015], the respondent did not establish that his brother is still being targeted by the Sri Lankan military." Nothing in the record disturbs that finding, which undermines any argument that Lingeswaran's fear remains objectively reasonable, even assuming it once was objectively reasonable. *See Djonda*, 514 F.3d at 1176 ("[W]e would still deny . . . relief because the record does not compel the conclusion that [the petitioner] has a well-founded fear that he will be treated like his brother[].").  And, other than his own merits hearing testimony, Lingeswaran did not provide any evidence that the Sri Lankan army told his brother that they would imprison Lingeswaran for a significant period or otherwise harm him. *See id.* at 1176.

Finally, the IJ found that "there is no evidence whatsoever that his name is on the list at the airport, that as soon as he gets there he is going to be picked up

18

and incarcerated and perhaps even killed." We agree. Nothing in the record, other than Lingeswaran's vague, uncorroborated testimony about a warning given to his brother in 2015 by an unidentified member of the Sri Lankan army, indicates that Lingeswaran's name is on any airport list. Thus, the record does not compel us to find that that Lingeswaran has an objectively reasonable fear that the Sri Lankan army will single him out for persecution. *Sepulveda*, 401 F.3d at 1231.[15]

### b. Pattern or Practice of Persecution

But "[a]n alien does not have to prove he would be singled out if he can establish a pattern or practice of persecution of a group of which he is a member." *Mehmeti v. U.S. Att'y. Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (citing 8 C.F.R. § 208.13(b)(2)(iii)). To that end, Lingeswaran claims that he has a credible fear of persecution based on the Sri Lankan government's "pattern or practice" of persecuting Tamils. Against the IJ's finding that the treatment of Tamils in Sri Lanka is not so extreme and pervasive to constitute a pattern or practice of persecution, Lingeswaran claims the evidence in the record does in fact show such a pattern or practice.

---

[15] As noted previously, the IJ observed that there were some inconsistencies between Lingeswaran's testimony and his application. For example, the first and only time that Lingeswaran stated that his brother reported that the Sri Lankan army would kill him was at his May 8, 2017 merits hearing. Similarly, the first time Lingeswaran stated definitively that his name was on a list was during his merits hearing. Although the IJ did not go so far as to say that his testimony was generally not credible, the IJ found these inconsistencies factored into Lingeswaran's burden of proof.

19

Substantial evidence in the record shows that although the Sri Lankan government regularly treated Tamils horrifically during the civil war, the government does not have a pattern or practice of doing so now.  Instead, the Sri Lankan government has made recognized efforts to improve the situation for Tamils and reconcile the country since the conclusion of the war, albeit slowly.  One 2015 news article from the Tamil Guardian reports that in that year, in an effort of reconciliation, the Sri Lankan government launched an internal investigation into the treatment of Tamils during the civil war.  Another background document from 2016, an immigration assessment undertaken by the Australian government, reflects that, since coming to power in 2015, the Sri Lankan government has:

> established a new reconciliation taskforce mandated with 'healing the wounds of mistrust and social and cultural stress generated from extended conflicts between different communities in Sri Lanka,' replaced military governors with civilian governors in the Northern and Eastern Provinces, reduced high security zones, released land formerly held by the military, released some individuals held under the Prevention of Terrorism Act 1979 (PTA) and engaged constructively with the Tamil National Alliance (TNA) and the international community.

It also highlights that "the situation has markedly improved for Tamils since the end of the war."  Specifically, "incidences of extra-Judicial killing, disappearances and kidnappings for ransom has fallen considerably" since the end of the civil war and "do not appear to be ethnically[ ]based."  And a 2017 article from the

20

Australian Associated Press reports that the Sri Lankan Prime Minister urged asylum seekers to return to the country, insisting that "[i]t is quite safe for them to come back." The record also shows that Tamils have made political advancements in Sri Lanka. According to the 2016 Australian government study, a free and fair election in 2015 resulted in Tamil representation in the Sri Lankan Parliament. That same year, the Prime Minister "vowed to implement the India-backed 13th Amendment within a unitary framework for the devolution of power to [Tamil] provinces, to achieve reconciliation with the minority Tamil community."

To be sure, the record also shows that Tamils still encounter discrimination and mistreatment. But because substantial evidence in the record supports the agency's finding that the mistreatment of Tamils in Sri Lanka is not so extreme and pervasive as to establish a pattern or practice of persecution, that conclusion must stand.

Lingeswaran relatedly claims that the BIA and IJ committed legal errors. First, he argues that the IJ erred by failing to consider the background country materials he submitted into evidence and, if it had, the IJ would have found a pattern or practice of discrimination against Tamils. True, "the [Immigration Judge] must ... consider all evidence introduced by the applicant." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (alterations in original) (quoting *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir.2005). But while the IJ

21

must consider all the evidence, it does not need to discuss each piece of evidence in its order. *Id.* (noting that we do not require IJs to address each piece of evidence specifically so long as there is enough on the record for appellate review). In its analysis of Lingeswaran's claim, the IJ relied on and cited specific exhibits. It also stated that in rendering its decision it "ha[d] considered all admitted evidence in its entirety" and provided a summary of the exhibits. Thus, the IJ committed no legal error in that respect.

Lingeswaran also attacks the weight the IJ gave to the evidence. Specifically, he argues that the IJ did not sufficiently consider the "Resolution on Genocide" report he submitted. Although IJs are "obligated to consider [an applicant's] documentary evidence," they are "under no obligation to credit it or assign it decisive weight." *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1347 (11th Cir. 2008). The IJ did not err just because it did not afford a certain piece of evidence as much weight as Lingeswaran wished.

Finally, Lingeswaran charges that the BIA erred in failing to engage in a "disfavored group" analysis under 8 C.F.R. § 1208.13(b)(2)(iii), the regulation governing pattern-or-practice claims. This claim likewise fails.

Section 1208.13(b)(2)(iii) provides that the agency "shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution" if:

22

(A) The applicant establishes that *there is a pattern or practice* in his or her country of nationality or, if stateless, in his or her country of last habitual residence, *of persecution of a group of persons similarly situated to the applicant* on account of race, religion, nationality, membership in a particular social group, or political opinion; *and* (B) The applicant establishes *his or her own inclusion in, and identification with, such group of persons* such that his or her fear of persecution upon return is reasonable.

(emphasis added).  In other words, an applicant who cannot establish that he will be singled out for persecution must prove both (1) that there is a pattern or practice of persecuting a group and (2) that he is a member of that group.  As discussed above, substantial evidence supports the BIA's finding that Lingeswaran had not established a pattern or practice of persecuting a group to which he belonged.  Thus, to the extent he contends that the BIA failed to conduct a pattern-or-practice analysis, the record belies his argument.

Lingeswaran's reliance on Ninth Circuit authority, however, indicates that he is making a different argument.  The Ninth Circuit has embraced a judicially-created "disfavored group" test, under which an applicant who cannot show a pattern or practice of persecution is nevertheless eligible for asylum if he can establish that (1) he is a member of the group that is "disfavored," and (2) he has "an individualized risk of being singled out for persecution."  *See Sael v. Ashcroft*, 368 F.3d 922, 925 (9th Cir. 2004).  Under Ninth Circuit precedent, these elements "operate in tandem," meaning that "the 'more serious and widespread the threat' to

23

the group in general, 'the less individualized the threat of persecution needs to be.'" *Id.* Under that test, asylum applicants are eligible for relief if they establish membership in a group that is "disfavored," and they have "an individualized risk of being singled out for persecution." *Id.*

Because the "disfavored group" test departs from the plain language of the statute, we join our sister circuits in rejecting this "judicially created alternative to the statutory and regulatory scheme." *Kho v. Keisler*, 505 F.3d 50, 55 (1st Cir. 2007); *Firmansjah v. Gonzales*, 424 F.3d 598, 607 n.6 (7th Cir. 2005); *Lie v. Ashcroft*, 396 F.3d 530, 538 n.4 (3d Cir. 2005). The Ninth Circuit's "disfavored group" test conflicts with the plain language of § 1208.13(b)(2)(iii), which provides for two alternative methods of establishing a well-founded fear of future persecution: an applicant can show either that he will be "singled out individually for persecution" or that there is "a pattern or practice" of persecuting a group to which he belongs. 8 C.F.R. § 1208.13(b)(2)(iii). Section 1208.13(b)(2)(iii) does not contemplate different burdens of proof depending on whether an applicant is a member of a group that is "disfavored." While evidence that an applicant is a member of a disfavored group can surely be relevant in assessing whether an applicant has carried his burden to show either (1) that he will be individually singled out for persecution or (2) that he will be persecuted pursuant to a pattern or practice, that is quite different than saying membership in a disfavored group

24

lessens an applicant's *burden* to show a reasonable possibility of future persecution, as the "disfavored group" test allows.  In short, we disagree with the Ninth Circuit that the degree to which a group is disfavored alters an applicant's burden to establish either an individualized risk or a pattern or practice of persecution.  Accordingly, the agency did not err by failing to analyze Lingeswaran's well-founded fear of future persecution claim under the "disfavored group" test.

B. CAT Claim

Lingeswaran argues the BIA erred in finding that he did not qualify for withholding of removal pursuant to CAT because the Sri Lankan government continues to execute atrocities against Tamils and his family members in Sri Lanka live in fear.  To be eligible for relief pursuant to CAT, an applicant must meet a higher burden than for asylum eligibility, and show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 208.18(c)(2).  CAT only provides protection from torture where it is "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 208.16(a)(1); *see also Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1323; *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239 (11th Cir. 2004).  Acquiescence "requires that the public official, prior to the activity constituting torture, have awareness of such activity

25

and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). "The burden of proof for an applicant seeking withholding of removal under the Convention, like that for an applicant seeking withholding of removal under the statute, is higher than the burden imposed on an asylum applicant." *Najjar*, 257 F.3d at 1303; *see also* 8 C.F.R. § 208.16(c)(2).

The record does not compel a finding of torture by, or at the acquiescence of, the Sri Lankan government. To the contrary, according to a U.S. State Department report, since the end of the civil war in 2009, the government of Sri Lanka has established procedures to investigate claims of torture and arrested military police and other officials suspected of involvement in torture. And according to a report by a non-profit organization, "Freedom from Torture," the Sri Lankan government has also adopted policies and passed legislation aimed at protecting victims, witnesses, and detainees. Moreover, in 2016, the Sri Lankan government established a committee, charged with "visit[ing], examin[ing], and tak[ing] preventative measures on allegations of torture," as well as the Office of National United and Reconciliation, charged with "coordinating the government's efforts toward reconciliation." A government does not "acquiesce" to torture where it "actively, albeit not entirely successfully, combats" the alleged torture. *Reyes–Sanchez*, 369 F.3d at 1243. Accordingly, we deny Lingeswaran's petition for review of the denial of relief under CAT.

26

IV.

In sum, substantial evidence supports the BIA's rejection of Lingeswaran's claims for asylum, withholding of removal, and CAT relief.  And neither the IJ nor the BIA committed any legal errors.  Accordingly, Lingeswaran's petition for review is **DENIED**.[16]

---

[16] Judge Wilson concurs with our decision in this case, but writes specially to note that he agrees with Judge Jordan's interpretation of the INA's "at least one central reason" standard, as set out in 8 U.S.C. § 1158(b)(1)(B)(i).  *See Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748, 758–65 (11th Cir. 2019) (Jordan, J., concurring in part and dissenting in part).  Notably, on that point, Judge Jordan was writing in dissent in the unpublished, non-precedential decision in *Diaz-Rivas*.  In contrast, Judge Grant, who authored the majority opinion in *Diaz-Rivas*, interpreted the term "central reason" to mean "a reason of primary importance to the persecutors, one that is *essential* to their decision to act. . . . In other words, a motive qualifies as central if the persecutor would not have harmed the applicant if the protected trait did not exist." 769 F. App'x at 754 (quotations omitted). We find Judge Grant's interpretation to be well-reasoned.  Nonetheless, we agree with Judge Wilson that given the particular facts of the case now before us, we do not have to resolve the question at issue in *Diaz-Rivas*.

WILSON, Circuit Judge, concurring:

I concur with the majority but write separately to clarify my analysis of Lingeswaran's past-persecution theory of asylum.  Eligibility for asylum relief turns on the reason(s) for persecution.  *See* 8 U.S.C. § 1158(b)(1)(B)(i).  "[T]he applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant."  *Id.*

I agree with Judge Jordan's interpretation of the "at least one central reason" standard.  *See Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748, 758–65 (11th Cir. 2019) (Jordan, J., concurring in part and dissenting in part).  The statute plainly contemplates the possibility that a persecutor may have "multiple central reasons" for persecuting an applicant.  *Id.* at 763.  If the facts of a case bear out that possibility, the statute requires only that a protected reason be "one" of the multiple central reasons shown.  § 1158(b)(1)(B)(i).  "[T]he applicant *is not required* to show that the protected reason was the primary or dominant reason they were persecuted."  *Diaz-Rivas*, 769 F. App'x at 760.  "Requiring primacy or dominance would recast the inquiry as one into 'the central' as opposed to 'at least one central' reason for persecution and would vitiate the possibility of a mixed motive claim."  *Id.* (alterations adopted) (internal quotation marks omitted).

28

Lingeswaran's problem is that he failed to show that a protected reason was a reason at all for his alleged persecution. The agency found that the Sri Lankan army had only one motivation here: its legitimate investigation of LTTE terrorist activity during the civil war. The IJ found that the army "questioned [Lingeswaran] not because [of a protected ground], but rather because of their belief that he may have been associated with a terrorist organization, the LTTE Tigers." In other words, this case does not involve mixed motives, and the one reason for persecution is not protected. *See* § 1158(b)(1)(B)(i). Therefore, Lingeswaran did not establish that a protected ground "was . . . at least one central reason for" his alleged persecution. *See id.*