[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12907

_____

Agency No. A97-204-149

GLORIA ARCIBELLY LOPEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 6, 2007)**

Before CARNES and WILSON, Circuit Judges, and STAGG[*], District Judge.

CARNES, Circuit Judge:

_____

[*] Honorable Tom Stagg, United States District Judge for the Western District of
Louisiana, sitting by designation.

Gloria Arcibelly Lopez, a Colombian native, joined the Colombian Liberal Party in 1995 as a community coordinator, providing humanitarian assistance to residents of poor communities and conducting seminars on the principles of the Liberal Movement. In January 1998 she began receiving threatening phone calls from the Revolutionary Armed Forces of Colombia, the FARC. The callers instructed her to abandon her activities with the Liberal Party. Lopez did not report the calls to the police.

In April 1999, Lopez returned to Colombia after spending six months in the United States with her mother. She resumed her Liberal Party activities, and in September of that year, after leaving a community event, she was approached by a man and a woman who identified themselves as FARC members, insulted her, and told her that she should resign from the Liberal Party and not come back to the area. Lopez continued her work. On November 27, 1999, she was confronted by a man and two women.[1] They told her: "We are from FARC revolutionary militias and we already warned you that you should not return to these places." Then they began hitting her about the face and arms, eventually throwing her to the ground. Nothing was stolen from Lopez, but as a result of the attack she was

[1] The IJ's order states that Lopez was attacked by two women, but Lopez's own testimony, which we must accept as true, indicates that she was attacked by two women and a man.

2

forced to seek medical attention. The medical report found: "[c]onclusive trauma on [her] face, thorax and arms," lacerations on her forearm and elbow, and at least some bruising. Again, Lopez did not file a police report.

After that attack, Lopez withdrew from her political activities for some time. Then in June 2001, Lopez resumed her humanitarian work. Even though she tried to be more discrete, local residents warned her that members of the FARC were asking about her. The FARC made threatening phone calls both to Lopez's place of work and to a rental property she owned, which resulted in Lopez once more stopping her community involvement for a while. Again, she made no police report.

In August 2002 Lopez and her mother began conducting training workshops, which were supported by the Liberal Party, to teach local women how to manage their household finances. She was warned by her students on October 12, 2002 that she needed to be careful, and on October 19, 2002, at the end of a session, three armed men burst into the classroom and told Lopez: "We are members of FARC's urban militia[;] we sent you a message last week with one of our students. We don't want any shit workshops in our territory because what you are doing is trying to brainwash our people and buy votes for those SOB politicians." Lopez left Colombia and arrived in the United States on November

3

8, 2002.

On July 15, 2003, the Department of Homeland Security issued Lopez, who had overstayed her visa, a notice to appear. At a hearing in October 2003 Lopez appeared and conceded her removability. She sought asylum, withholding of removal, and relief under the Convention Against Torture. Although the IJ failed to make an explicit credibility finding, she stated: "we are to take everything that she has told the Court today at face value." Even though she accepted Lopez's testimony as true, the IJ found that she had failed to meet her burden of proof in establishing refugee status and denied all three of her requests.

More specifically, the IJ determined that Lopez's activities were community-based and not political in nature. She also held that the harm alleged by Lopez was insufficient, because the phone calls did not establish past persecution and Lopez had failed to show that the physical attack was more than a random act of violence. The IJ said that Lopez's failure to report the November 1999 attack to the police in Colombia hurt her case, because "[i]n the absence of a police investigation, the Court cannot make a determination whether this was politically motivated or whether the respondent was a victim of a crime." Nonetheless, the IJ all but made that determination, stating in the next sentence: "It appears the respondent was a victim of a crime because in this case she does

not even contact the authorities in order to obtain their protection first before traveling outside of her home country to obtain the protection of the United States."

Lopez timely appealed the IJ's decision to the BIA, challenging the denial of her asylum and withholding of removal claims but abandoning her CAT claim. The BIA adopted and affirmed the IJ's decision, noting that although the IJ failed to make an express credibility finding, credibility was not at issue. The BIA also stated: "we agree with the Immigration Judge that because the respondent did not seek protection from law enforcement authorities in Colombia after her encounters with the [FARC] . . . she failed to demonstrate that the Colombian government is unable or unwilling to protect her." This appeal followed.

Lopez now contends that the BIA erred (1) in finding that she did not suffer past persecution sufficient to merit asylum and (2) in denying her petition for relief on the ground that she had failed to seek help from the Colombian authorities, which she claims would have been futile.

**I.**

When the BIA issues a decision, we review only that decision, except to the extent the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we

5

will review the IJ's decision as well." Id. Here, because the BIA adopted and affirmed the IJ's decision, adding some of its own comments, we review both decisions. Legal determinations are reviewed de novo. D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). However, any factual determinations are reviewed under the substantial evidence test, and we "must affirm the . . . decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283–84 (quotation marks omitted). That means a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal. . . . " Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

## II.

Given that both the IJ and BIA accepted Lopez's testimony as true, we must do so as well. Once that is done the record compels the conclusion that the November 1999 attack on her was politically motivated instead of a random, criminal act. Lopez had just attended a community event earlier that evening. The attackers identified themselves as members of the FARC, and they told Lopez that she had been "already warned." That was an obvious reference to the threatening phone calls she had received ordering her to stop her activities with

6

the Liberal Party, and to the man and woman from the FARC who, two months before the attack, had confronted her and told her to resign from the Liberal Party and not come back to the area. There is also the fact that during the attack nothing was stolen from her, as it probably would have been during a mugging or other type of robbery. The IJ should have found that the November 1999 attack on Lopez was politically motivated.

Because the IJ did not do so, she did not consider the attack in the past persecution analysis. Instead, the IJ only considered the phone calls and verbal threats as politically motivated, and concluded that those were insufficient to constitute persecution. That is why the IJ was able to rely on Sepulveda v. United States Attorney General, 401 F.3d 1226 (11th Cir. 2005) (per curiam), our decision holding that verbal threats and threatening phone calls alone are insufficient to show persecution. See id. at 1231. We decline to decide in the first instance whether all of the threats Lopez received and the physical attack in November 1999, which are to be considered together, amount to persecution. See Ruiz v. Gonzales, 479 F.3d 762, 766 (11th Cir. 2007) (noting that the question is whether the politically motivated conduct considered cumulatively amounts to past persecution).

A remand is preferable so that the IJ can decide this issue in the first instance. In Gonzalez v. Thomas, 547 U.S. 183, 126 S. Ct. 1613 (2006) (per curiam), the Supreme Court summarily reversed the Ninth Circuit in an immigration case for failing to apply the "ordinary 'remand' rule," under which "[a] court of appeals is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions. . . ." Id. at —, 126 S. Ct. at 1614–15. Instead, the Court held that the IJ (with right of review to the BIA) must first "determin[e] the facts and decid[e] whether the facts as found fall within a statutory term." Id. at 1615 (quotation marks and citations omitted). Here, that means we should allow the IJ to determine, among other facts, the extent and severity of the November 1999 beating, and then apply to all of the facts the law relating to persecution. Accord, INS v. Ventura, 537 U.S. 12, 16, 123 S. Ct. 353, 355 (2002) (per curiam) (summarily reversing the Ninth Circuit for failing to apply the "ordinary remand rule," and holding that "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"); Antipova v. United States Att'y Gen., 392 F.3d 1259, 1265 (11th Cir. 2004) (noting that where there has not been a proper determination as to political persecution, we remand for the IJ to make one in the first instance). If we were to rush ahead and decide the

8

persecution issue ourselves, we might be viewed as committing the same sin of overeagerness that got the Ninth Circuit summarily reversed in <u>Ventura</u> and then again in <u>Gonzalez</u>.

## III.

A remand is also in order for another reason. "As a matter of immigration policy, a government may expect that an asylum seeker be unable to obtain protection anywhere in his own country before he seeks the protection of another country." <u>Mazariegos v. United States Att'y Gen.</u>, 241 F.3d 1320, 1327 (11th Cir. 2001). As a result, in order to satisfy her burden of establishing asylum eligibility, Lopez must show not only past persecution or a well-founded fear of future persecution, but also that she is unable to avail herself of the protection of her home country. <u>Id.</u>

The BIA ruled that because Lopez did not "seek protection from law enforcement authorities in Colombia after her encounters with the [FARC] . . . she failed to demonstrate that the Colombian government is unable or unwilling to protect her." Although it is not entirely clear, the ruling appears to be that the failure to seek protection without more is enough to defeat a claim for asylum. If so, that decision is not fully consistent with <u>S-A-</u>, 22 I. & N. Dec. 1328, 1335 (BIA 2000). Although the failure to report persecution to local government

authorities generally is fatal to an asylum claim, <u>Mazariegos</u>, 241 F.3d at 1327, the BIA in <u>S-A-</u> held that it would be excused where the petitioner convincingly demonstrates that those authorities would have been unable or unwilling to protect her, and for that reason she could not rely on them. 22 I. & N. Dec. at 1335. Lopez contends that through her testimony and the country reports she has convincingly made the showing required by <u>S-A-</u>, and that is a contention which neither the IJ nor the BIA addressed. It should be addressed on remand.

Accordingly, we **GRANT** the petition for review and **REMAND** to the BIA for further consideration consistent with this opinion.