[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13991
Non-Argument Calendar
_____

Agency Nos. AXXX-XX6-495; AXXX-XX6-496

VILMA ISABEL CASTILLO MUNOZ,
ADA GISSELL CASTELLANOS CASTILLO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(October 3, 2019)

Before MARTIN, JILL PRYOR, and ANDERSON, Circuit Judges.

PER CURIAM:

Vilma Castillo Munoz and her daughter, Ada Castellanos Castillo, petition for review of the Board of Immigration Appeals' ("BIA") decision affirming the denial of their applications for asylum.  After careful consideration, we deny the petition.

## I.

Castillo Munoz is a 43-year old native and citizen of Honduras.  She married her husband, Lelis Armando Castellanos Rivera, in 1995.  They lived together in El Progreso, Honduras, along with their daughter, Ada Castellanos Castillo, for a number of years.  Castellanos Rivera began working as a loan shark in 2012.  In 2014, he began receiving death threats by phone.  However, according to Castillo Munoz, Castellanos Rivera never informed the police about these threats because a friend told him the "police would not help him unless he had 'proof' of the threats."  Castellanos Rivera unsuccessfully tried instead to get a tourist visa to come to the United States.

On August 16, 2014, Castellanos Rivera received a call from a woman named Adoris Guzman Rodriguez.  After their conversation, Castellanos Rivera left to collect money from her.  As soon as Castellanos Rivera left the house, however, Guzman Rodriguez called two hitmen who had been hired by someone else to follow and kill him.  Fifteen minutes later, the hitmen, Milton Pavon Robles

2

and Carlos Martinez Orellana, killed Castellanos Rivera while he was on his way back home.

Castillo Munoz found out about her husband's murder shortly after and immediately went to the scene of the crime. By the time she arrived, the media had already begun reporting on the murder. Castillo Munoz agreed to be interviewed and told the reporters her husband went to collect money from Guzman Rodriguez before he was killed. She also gave a statement to police officers identifying Guzman Rodriguez as the woman who called Castellanos Rivera. She then led the officers to Guzman Rodriguez's home, where they arrested Guzman Rodriguez on the spot. Pavon Robles was arrested the same day, and Martinez Orellana the day after.

A few days after the arrests, Castillo Munoz began receiving death threats by phone. She suspected the callers were family members of the arrested, although she did not know for certain. The callers told her, "[Y]ou're going to die, you fucking whore" and said the "same thing that happened to [her] husband" would happen to her. Castillo Munoz did not report these threats to the police because "the Honduran police doesn't [sic] do anything. They only move and start doing anything if the people have money and they show up and they're bribed." Afraid for her safety, she moved from Progreso to Santa Cruz of Yojoa, a different part of Honduras. She stayed in Santa Cruz of Yojoa for five or six months, coming back

3

to Progreso only once to testify at the initial hearing against Guzman Rodriguez, Pavon Robles, and Martinez Orellana for the murder of her husband.

When she appeared to testify at this hearing, Castillo Munoz was "nervous" and "fear[ed] for her life." As a result, the judge and prosecutor at her initial hearing allowed her to testify anonymously. But the anonymity did little to mask her identity, given the substance of her testimony. At the hearing, the prosecutor told the judge that a man in the United States had ordered Castellanos Rivera killed. The unidentified man contacted Guzman Rodriguez to serve as bait for the murder and paid the two hitmen several thousand lempiras to carry out the killing. Most troubling for Castillo Munoz, the assassins saw her interview on television with reporters and made plans for what to do if officials came to investigate. According to Castillo Munoz, both the prosecutor and a police officer told her to leave Honduras because it was no longer safe for her.

Castillo Munoz stayed in Honduras. After Castillo Munoz testified and returned to Santa Cruz of Yojoa, the threats continued. The calls only stopped after she changed numbers. She was later contacted by a neighbor who told her that a black car drove past Castillo Munoz's old home and the people inside the car asked for her by name. Terrified the callers would make good on their threats, she continued moving around Honduras, eventually fleeing to Mexico and then the United States with her daughter in 2016. Two of her sons and one other daughter

4

stayed behind in Honduras to live with her brother because she could not afford to take them with her.

Castillo Munoz successfully passed a credible fear assessment and applied for asylum, withholding of removal, Convention Against Torture ("CAT") protection, and humanitarian asylum. Her daughter, Ada Castillo, was added as a derivative beneficiary of her applications.[1] Prior to Castillo Munoz's merits hearing, which was scheduled for September 13, 2017, she timely submitted a prehearing brief outlining her arguments, a personal declaration, two expert declarations, and a number of supporting documents. Among these exhibits was an affidavit from an investigator declaring that all three defendants arrested for the murder had been convicted and sentenced. The affidavit also included information that Castillo Munoz's statements to the police and at the initial hearing were admitted at trial.

Castillo Munoz and two experts testified at her merits hearing. Castillo Munoz testified about the circumstances surrounding her husband's murder and the threats she received after. One expert testified about sexual violence in Honduras in support of Castillo Munoz's application for humanitarian asylum. The other expert, Dr. Mark Ungar, testified about Honduras's policing practices and attempts at criminal reform. Dr. Ungar testified that gangs in Honduras "pay bribes to

---

[1] This opinion will refer to both applications as Castillo Munoz's application.

different officials who are involved" and "one of the major challenges in [Honduras] is a lot of the police officials and other officials involved in the security system collaborate with the gangs." As he described it, either the officers would "proactively collaborat[e] with [the gangs] or . . . look the other way to criminal activities." He also testified that based on his review of Castillo Munoz's materials that it appeared she and her husband were the victims of organized crime.

Aside from the corruption issues, Dr. Ungar testified the Honduran police were "not effective . . . because of the lack of resources and a lack of training." He explained officers were given guns without training and had no idea "how to do [an] investigation," so "only about three percent of murders actually get to trial and conviction." He also testified that although the Honduran government had programs "on paper" to protect witnesses, "in practice, they don't function at all." According to Dr. Ungar, "[a] lot of assassinations are carried out from behind the prisons." However, he also acknowledged the Honduran government recently "created two . . . very strong and well-funded agencies in the direction of police investigations," which were showing signs of success.

At the conclusion of the hearing, the immigration judge ("IJ") denied Castillo Munoz all relief and ordered her removed to Honduras. As relevant here, the IJ found that although Castillo Munoz was credible, she failed to show the Honduran government was either unwilling or unable to control the people

6

threatening her.  The IJ relied heavily on the fact that police officers successfully investigated the murder of Castillo Munoz's husband and Castillo Munoz never notified the officers of the threats she received.

Castillo Munoz appealed the decision to the BIA, which dismissed the appeal.  The BIA found she failed to establish a well-founded fear of future persecution because "the record evidence did not indicate that the police would be unwilling or unable to protect [her] if they knew about the death threats."  To support its decision, the BIA, like the IJ, relied on the fact that "[t]he police investigation of the murder and subsequent trial resulted in convictions against three individuals involved in the murder."  The BIA also rejected Castillo Munoz's argument that the IJ failed to review all of the record evidence.

Castillo Munoz timely petitions for review.

## II.

This Court reviews de novo "an assertion that the agency failed to give reasoned consideration to an issue."  Jeune v. U.S. Att'y Gen., 810 F.3d 792, 799 (11th Cir. 2016).  This Court reviews the agency's factual findings for substantial evidence, meaning we reverse "only if the evidence compels" a contrary finding. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1230–31 (11th Cir. 2006) (per curiam) (quotation marks omitted).

## III.

Castillo Munoz first argues the BIA erred in rejecting her reasoned consideration claim.  She contends the record reflects the IJ failed to read her prehearing briefing or review the evidence in the record before denying her application for asylum.[2]  We are not persuaded.

As Castillo Munoz concedes, the IJ stated he "considered all of the other documents that have been filed in this case, including the respondent's brief in support of her application" before denying her application for asylum.  Although a blanket statement may not, in some circumstances, be enough to demonstrate reasoned consideration of the evidence, that is not the case here.  There is no evidence the IJ did not read the prehearing briefing before making his decision.  Indeed, the IJ announced at the beginning of Castillo Munoz's hearing he was "familiar" with the brief and would "read it."

Neither are we persuaded by Castillo Munoz's argument that the IJ's frequent clarifying questions meant he never reviewed the materials she submitted.  To the contrary, it appears the IJ wished to make sure he understood the record

---

[2] Castillo Munoz does not challenge on appeal the agency's denial of her applications for withholding of removal, CAT protection, or humanitarian asylum.

8

correctly. This is no more and no less than what he was required to do. See 8 U.S.C. § 1229a(b)(1).

At bottom, an agency displays a lack of reasoned consideration when its decisions cast into doubt whether the agency truly "heard and thought" rather than "merely reacted." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1374 (11th Cir. 2006) (quotation marks omitted). The record indicates the IJ considered Castillo Munoz's claims and evidence in full. We therefore deny her petition for review as to this claim.

## IV.

Castillo Munoz next challenges the BIA's finding that she was unable to show the Honduran government would be unable or unwilling to control her persecutors. This argument, too, fails to persuade.

"An applicant for asylum who alleges persecution by a private actor must prove that his home country is unable or unwilling to protect him." Ayala v. U.S. Att'y Gen., 605 F.3d 941, 950 (11th Cir. 2010). Castillo Munoz argues the record compels the finding that the Honduran government would be unwilling or unable to protect her from the unidentified individuals who have threatened her. We cannot agree.

The record contains conflicting accounts on the ability of Honduran officials and police officers to protect victims or witnesses of crime. On the one hand, the

9

police successfully apprehended three of Castillo Munoz's husband's murderers, all of whom were eventually convicted. Dr. Ungar also testified the Honduran government was making inroads on improving the quality of police investigations. On the other hand, both a prosecutor and a police officer told Castillo Munoz she was no longer safe in Honduras, and there was expert testimony that the Honduran government's programs to protect witnesses were functionally nonexistent.

Unfortunately for Castillo Munoz, "the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1230 (11th Cir. 2007) (quotation marks omitted). We recognize the Honduran government's ability to arrest and prosecute the individuals who murdered Castillo Munoz's husband does not go directly to its ability to preemptively protect Castillo Munoz from harm. But neither is it irrelevant. Castillo Munoz requested and received anonymity from prosecutors and worked closely with the police officers investigating the murder. Beyond that, there was evidence the Honduran government is investing additional resources in improving the quality of law enforcement investigations. It was reasonable on this record to find, as the BIA

10

and the IJ did, that the Honduran government would have taken the threats against

Castillo Munoz seriously if only it had known about them.[3]

**PETITION DENIED.**

---

[3] We do not mean to suggest an asylum applicant must always go to law enforcement first to qualify for asylum.  But where, as here, the applicant cites general concerns about bribery as her reason for not seeking out government protection, the agency's decision will ordinarily survive substantial evidence review.  See Lopez v. U.S. Att'y Gen., 504 F.3d 1341, 1345 (11th Cir. 2007) ("Although the failure to report persecution to local government authorities is generally fatal to an asylum claim, . . . [the failure can] be excused where the petitioner convincingly demonstrates that those authorities would have been unable or unwilling to protect her, and for that reason she could not rely on them."); see also Bringas-Rodriguez v. Sessions, 850 F.3d 1051, 1073–75 (9th Cir. 2017) (en banc) (concluding the record compelled a finding that the government was unwilling or unable to protect the petitioner where the petitioner testified the police "laughed" and didn't do anything when his friends reported being raped and there was significant documentary evidence that Mexican officials participated in persecuting gay men like the petitioner).