[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11867

Non-Argument Calendar

_____

WINDELL GORDON,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A078-085-496

_____

Before LUCK, BRASHER, and ANDERSON, Circuit Judges.

PER CURIAM:

Windell Gordon petitions for review of the Board of Immigration Appeals' order affirming the denial of his application for relief under the Convention Against Torture. After careful review, we partly dismiss and partly deny Gordon's petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Gordon is a Jamaican native and citizen. He came to the United States in 1997 on a student visa. Ten years later, he was convicted of cocaine-trafficking offenses and sentenced to 156 months' imprisonment. Gordon was released from prison in 2015—after successfully seeking a two-level sentence reduction—and the government then ordered him deported as a noncitizen convicted of an aggravated felony. After an asylum officer determined Gordon had established a reasonable fear of persecution, he applied for deferral of removal under the Convention.[1]

### The Record Evidence

The immigration judge held two merits hearings on Gordon's application. Gordon testified, as did his cousin Kingsley

---

[1] Gordon also applied for withholding of removal under 8 U.S.C. section 1231(b)(3)(A), but he conceded his ineligibility before the immigration judge.

Gayle and Dr. Damion Blake, an expert on "the intersection of politics, government, organized crime, and gang violence" in Jamaica.

Gordon testified that his best friend growing up—Reeve Bullock, called Bulla—operated a "small time" drug trafficking organization that purchased marijuana from police officers and distributed the drugs locally. As Bulla's close, trusted friend, Gordon was often present during these purchases and thus recognizable to the officers involved. People in Jamaica (and in Bulla's organization) knew him by the alias Panther.

After Gordon left for the United States, Bulla's trafficking organization graduated to cocaine—and expanded its market to other Caribbean nations and the United States. Gordon testified that, as the operation expanded, so did involvement of (and investment by) government officials of many stripes—including police officers, immigration and customs officials, and members of parliament.

Eventually, Gordon needed money and so re-engaged with Bulla's organization. He mostly worked with Edwin Murphy—whose job it was to retrieve the cocaine Bulla's organization imported using cruise ship workers—to distribute the drugs in Florida. But Gordon could also name Jamaican officials he'd either seen or spoken to by telephone. Bulla's brother-in-law, Delroy Hislop, was involved too. In 2004, Hislop was robbed of $130,000 and killed (in a car rented in Gordon's name) during a botched drug deal in Tampa.

Within the year, Gordon stopped distributing for Bulla. Gordon testified that Bulla and his organization accused him of arranging Hislop's murder. Gordon said Murphy also told the organization's members that Gordon had snitched in exchange for his early release from prison. For these reasons, Gordon feared he'd be killed by Jamaican officials involved in the organization—in retribution for snitching and for Hislop's murder, and to protect themselves—if he ever returned to Jamaica. Because of its connections with customs and immigration officials, the organization would be promptly alerted to Gordon's arrival. And because the people he could turn to for protection also wanted him killed, he wouldn't be safe anywhere in Jamaica.

Gordon described five episodes underlying his fear of execution should he return to Jamaica. First, Bulla and others in his organization threatened Gordon several times by telephone. The first time was shortly after Gordon's 2007 sentencing, when Bulla warned him not to do anything stupid because "Delroy's death is also hanging over your head and it won't be pretty." After Gordon's 2015 release, Bulla again threatened Gordon, this time using a Jamaican expression ("suck ya motha") meaning "we're going to kill you or[,] wherever we see you, we're going to hurt you." Gordon also testified that he received anonymous threatening calls "on numerous occasions."

Second, in 2015, the organization tried to orchestrate an attack on Gordon in prison by having Hislop's brother accuse him of stealing $250,000 from another prisoner. Third, Gordon said his

cousin Gayle also received threats. While visiting Jamaica in 2015, "unknown assailants" hijacked Gayle's car, "took [him] out of the car," searched the car for Gordon, and told Gayle to "let [Gordon] know that [he] must remember Delroy's death" and that they'd heard he was an informant. Fourth, Gordon said Bulla and others "look[ed] for [and] ask[ed] questions about [Gordon]" at his dad's 2017 funeral—which he'd promised his dad (who had received "many messages" threatening Gordon's life if he snitched) he wouldn't travel to Jamaica to attend.

Fifth and finally, Gordon testified that many of his Tampa drug distributors—including Lassie, Hot Beer, Rankin Bernard, Jaro Kelly, Delroy Diar, Eelie, Omar, and Blue Boy—were murdered by the organization after returning to Jamaica because of their assumed involvement, as Gordon's associates, in Hislop's death. According to Gordon's testimony and filed declaration, Lassie was killed in a police shootout "[b]ecause . . . he was a known thief or a known gunman" and "a troublemaker kid from Jamaica"; Hot Beer was shot by "[u]nknown assailants" in 2018, three years after being deported; in 2013, Rankin Bernard (an American citizen) was killed by police while vacationing in Jamaica; and Jaro Kelly—who had fled from the United States to Jamaica while on bond—was killed in 2003 on a boat between the Bahamas and the United States because Bulla's organization assumed he was going back to cooperate. As for the others, Gordon offered evidence only about roughly when the men were killed.

On cross-examination, the government asked why Gordon didn't file death certificates or other corroboration of his Tampa distributors' deaths. The immigration judge likewise questioned how Bulla's organization could find and kill the men yet Gordon couldn't track down documentation about their deaths—and how Gordon knew the men had been murdered because of their association with Gordon and not for some other reason. Gordon said he only knew the Tampa distributors' aliases (which Dr. Blake testified is common in Jamaica). Because the men were "known" by those aliases in Jamaica, they would've been easy to locate on the ground or through customs officials; however, Gordon said calling locals to ask for information (like the men's real names) would've raised red flags. As for how he knew why the men were killed, Gordon said he was the only connection between these men and Bulla's organization, so the organization assumed they were involved in Hislop's death.

The government also emphasized that Bulla and the trafficking organization had never harmed Gordon's family. The immigration judge raised this issue, too, pointing out that their failure to harm his family seemed to show "[t]hey clearly then think that [Gordon] hasn't spoken to the DEA." And the government queried why an organization so connected to immigration and customs officials needed to hijack Gordon's cousin's car—or attend his father's funeral—to determine whether he was in Jamaica. Finally, the government highlighted the lack of evidence—other than Gordon's testimony—about Bulla's drug trafficking organization,

questioning why Gordon hadn't filed any documents or news coverage corroborating its existence.  Gordon said the organization "is not publicly known" and deliberately "stay[s] below the radar of the public."

Turning to Gordon's expert witness, Dr. Blake testified that Gordon's description of Bulla's trafficking organization was "quite compelling"—and that he wasn't surprised the organization wasn't publicly known.  But he also said he'd "never really heard" of a situation where government officials were involved in the narcotics business as investors.  And he admitted that he'd never heard of Reeve Bullock before talking to Gordon.

Still, Dr. Blake expressed the opinion that, if Gordon returned to Jamaica, he'd be in "imminent danger of threats against his life . . . because of the perception that . . . he's an informant" (which, in Jamaica, is assumed once a person's been incarcerated) and because of "the perception and the allegations of his involvement in" Hislop's death.  In his expert report, Dr. Blake said the attempted "hit" while Gordon was imprisoned showed that Bulla's organization has a "death vendetta" against him which will be activated if Gordon returns to Jamaica.  Dr. Blake testified that government officials would know immediately when Gordon arrived, and there was nowhere Gordon could go within the small, "hyper-vigilant" country to be safe.  The lack of harm thus far to Gordon's family didn't counsel otherwise, Dr. Blake explained, because people with "elder status" are viewed with respect and "so oftentimes

they don't become part of the . . . dragnet of . . . revenge and re-prisal."

Dr. Blake opined that police or customs officials would ei-ther harm Gordon directly or communicate his location to Bulla's organization, then "essentially not provide any protection if he were to be so attacked"—both to rid Jamaica of a "bad apple" (as criminal deportees are viewed there) and to protect their secrets "about the nature, about the structure, and the operation of [Bulla's] organization." The immigration judge (and the govern-ment) pressed Dr. Blake about whether these officials would tor-ture or kill Gordon under color of law. Dr. Blake described "death squads" of uniformed police carrying out extrajudicial "execution-style killings." But he couldn't identify any specific government official likely to harm Gordon. And he acknowledged that an in-ternal affairs-type entity (INDECOM) investigates corrupt police officers, leading to convictions (albeit rarely).

Gayle, Gordon's cousin and final witness, testified that he believed Gordon's life would be in danger should he return to Ja-maica. Gayle explained that, while visiting Jamaica in 2007, he re-ceived "the threat of [his] life," "the worst thing [that] ever hap-pen[ed] to [him]." Early one morning, when he and a friend de-parted to visit a remote area, Gayle noticed a "strange vehicle" in the neighborhood. About five minutes into their drive, while on "a dark stretch of road," Gayle saw a car approaching—at first, its headlights were off; then they began flashing. Gayle was afraid, so he sped up but "could not outrun" the car, which tried to push him

off the road. Eventually the car passed him and then blocked the road; "two guys jump[ed] out . . . and came back running up to [Gayle's] car looking all crazy in their eyes." The men asked for Gayle's and his friend's names, then "shout[ed] back to somebody in the [other] car and said he's not here." The men then asked Gayle "where is Panther?"; after Gayle said he didn't know, the men drove off. Eventually Gayle and his friend continued on their way, and the car passed theirs twice more with its brights on. Gayle said he didn't know the men and couldn't tell whether they were police or civilians. On cross-examination, Gayle acknowledged he'd returned to Jamaica many times since then without being threatened or harmed, although he said that's because he "did not go into places."

Finally, Gordon filed numerous documents in support of his application. He submitted corroboration that Hislop died in April 2004. He submitted news reports about the arrest of Edwin Murphy in 2003 for smuggling cocaine via cruise ship workers. He also filed articles about the death of Hot Beer—which described him as a "violence producer . . . in and out of hot water with the law" ("constantly under the police radar") and indicated that, in 2018, he was "ambushed by a group of armed men who shot him multiple times." And he filed a news report about the murder of Omar—described as "one of Montego Bay's notorious gangsters," suspected of multiple murders and "feared by many, including fellow gangsters"—who was killed in a drive-by shooting shortly after his 2017 deportation. Gordon also submitted general news articles

about extrajudicial killings of "condemned criminals" in Jamaica, ordered by senior police officers and staged as shootouts; corrupt police officers feeding informants' names to gangs; the relationship between drug organizations, police, and politicians in Jamaica; and mass burial sites used by "the criminal underworld, often assisted by rogue policemen." Finally, Gordon filed numerous country condition reports.

## The Agency Decisions

The immigration judge denied Gordon's application. The immigration judge concluded that, without corroboration, Gordon had failed to sustain his burden of proof because his testimony, "although generally credible," conflicted at times with other record evidence and "lacked specificity[,] as [Gordon]'s answers were generally vague and broad." In particular, Gordon failed to establish the circumstances of his Tampa distributors' deaths, the motivation for those killings, and the connection between the killers and government actors—"details that go to the heart of [Gordon]'s claims." The immigration judge also determined Gordon failed to establish the government officials' involvement as investors, a feature of Bulla's organization that Dr. Blake considered novel.

The immigration judge further concluded that Gordon's corroborating evidence didn't satisfy his burden of proof. Specifically, Gordon failed to provide affidavits from people in Jamaica with knowledge about the deaths of Gordon's Tampa distributors. He also failed to submit death certificates. Although Gordon asserted that aliases are the norm in Jamaica and so he didn't know

the men's real names, the immigration judge observed that Gordon had been in business with the men for years in Tampa, not Jamaica. Plus, the news articles Gordon filed about Hot Beer and Omar undermined rather than corroborated Gordon's version of events, "provid[ing] a different light to the motives behind the deaths."

The immigration judge also determined, in the alternative, that Gordon's claim for relief failed on the merits. Gordon needed to establish—by more than a series of suppositions—that he'd more likely than not be tortured by a public official acting in his official capacity (or at the instigation of, or with the acquiescence of, such an official) if removed to Jamaica. But the immigration judge found no record evidence "that anyone in Jamaica, much less the government, is looking for [Gordon] to torture and kill him." Gordon hadn't suffered past torture, and Gayle (who the immigration judge found to be credible) testified only that the people who stopped his car had asked for Panther—not that they'd harmed Gayle or accused Gordon of Hislop's death "or anything else." Additionally, the immigration judge observed that, "despite [Gordon]'s assertion that Bulla believes he cooperated" with American authorities, Gordon's family remained unharmed—and "elder status" could explain Gordon's mother's safety but not his brother's. Same for Edwin Murphy, who served only six years of his twenty-year sentence (because he cooperated) yet now lives in Jamaica unharmed. These facts, the immigration judge concluded, weighed

against finding that Gordon was at risk of torture for being a perceived snitch.

The evidence of the Tampa distributors' deaths didn't help, the immigration judge found, because the record suggested more plausible explanations for the killings than those Gordon asserted. Gordon's own testimony "ma[de] the [immigration judge] believe that Lassie was killed because he was a 'known gunman' who was involved in a *shootout* with the Jamaican police." Likewise for Jaro Kelly, who Gordon said was killed because he tried to return to the United States, not because of his connection to Gordon or to Hislop's death. And Hot Beer—described by the media as a "violence producer . . . constantly under the police radar"—was killed years after his deportation, by what Gordon described as "unknown assailants." More importantly, Gordon also failed to establish that any of the Tampa distributors were killed by, with the consent of, or with the acquiescence of a Jamaican official (or that Lassie was killed unlawfully by the police). Instead, the record showed the Jamaican government was attempting to combat corruption (even if mostly unsuccessfully).

As a result, the immigration judge concluded that Gordon's claim was "overly speculative" and so denied his application. The immigration judge acknowledged Dr. Blake's contrary opinion but concluded that that opinion merited "limited weight" because it was based not on firsthand knowledge but primarily on Gordon's version of events.

Gordon appealed to the board, which dismissed his appeal. The board affirmed the immigration judge's findings that Gordon's testimony, standing alone, was insufficient to meet his burden and that Gordon submitted insufficient corroborative evidence to support his claims. The board noted that Gordon's testimony lacked details establishing that Bulla's organization blamed him for Hislop's death—and conflicted, on this point, with Gayle's telling of the car incident, which did not include a reference to "remember[ing] Delroy's death." The board also observed that the immigration judge wasn't required to accept Gordon's subjective belief about the Tampa distributors' killings, particularly when the documentary evidence "provided other plausible motives for their deaths." And the board rejected Gordon's argument that the immigration judge erred by failing to consider whether corroborating evidence was reasonably available, concluding that the immigration judge didn't deny Gordon's application solely due to the absence of corroborating evidence but also because the evidence Gordon did present undermined his claim.

In the alternative, the board affirmed the immigration judge's denial of Gordon's claim on the merits. The board concluded that the immigration judge reasonably found that Gordon's family's ongoing safety indicated Bulla's organization didn't believe he cooperated and so wasn't looking to harm Gordon for that reason. Finally, the board rejected Gordon's claims that the immigration judge erred by ignoring credible evidence or displaying unconscious bias; the board affirmed the immigration judge's

weighing of the evidence—including the determination that only a chain of suppositions supported Gordon's claim that the Jamaican government would consent to or acquiesce in his torture—and discerned no bias in the record.

## STANDARD OF REVIEW

We review the board's decision as the agency's final decision, unless the board expressly adopts the immigration judge's opinion or agrees with its reasoning. *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). When (as here) the board adopts or agrees with the immigration judge's reasoning, we review both. *See id.*

We lack jurisdiction to consider issues the petitioner could have but failed to exhaust before the board. 8 U.S.C. § 1252(d)(1); *Alim v. Gonzales*, 446 F.3d 1239, 1253–54 (11th Cir. 2006) (applying section 1252(d)(1) to Convention Against Torture claim). To exhaust an issue, a petitioner must both raise the "core issue" in his appeal to the board and "set out any discrete arguments he relies on in support of that claim." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016) (citations omitted).

Otherwise, we review de novo all legal issues. *Perez-Zenteno*, 913 F.3d at 1306; *Jeune*, 810 F.3d at 799. And we review factual determinations—including whether an applicant has established eligibility for relief under the Convention—under the "highly deferential substantial evidence test," which "requires us to 'view the record evidence in the light most favorable to the

agency's decision and draw all reasonable inferences in favor of that decision.'" *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1286, 1293–94 (11th Cir. 2020) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc)). We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Perez-Zenteno*, 913 F.3d at 1306 (citation omitted). "That means a finding of fact will be reversed 'only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough . . . .'" *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007) (quoting *Adefemi*, 386 F.3d at 1027).

## DISCUSSION

Gordon asserts two bases for reversal of the agency's decision. First, he argues that the agency erred in denying his claim for lack of corroboration without first finding that corroborating evidence was reasonably available. Gordon says the agency couldn't "have given reasoned consideration to the corroboration issue without addressing the reasonableness of obtaining the 'missing' corroborating evidence" or Gordon's explanations for not producing additional materials. Second, Gordon argues that the testimony and documentary evidence he presented were sufficient to meet his burden as a matter of law.[2]

---

[2] Gordon assumes 8 U.S.C. sections 1252(a)(2)(C) and (D) limit his appeal to questions of law, so he frames his arguments as errors of law. But *Nasrallah v. Barr* held these jurisdiction-stripping provisions inapplicable to judicial

We need not reach Gordon's first argument because, aside from concluding that Gordon failed to provide sufficient corroborating evidence to meet his burden of proof, the immigration judge denied Gordon's application—and the board affirmed—on an alternative ground: the evidence Gordon did present didn't establish his entitlement to relief under the Convention.

To qualify for relief under the Convention, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242 (11th Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (quoting § 208.18(a)(1)). Acquiescence "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* (quoting § 208.18(a)(7)). A government does not acquiesce to torture where it attempts to combat violence or corruption, even if its attempts are unsuccessful. *See Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1288 (11th Cir. 2021) ("[E]ven if Sanchez-Castro were right

---

review of an order denying Convention Against Torture relief. 140 S. Ct. 1683, 1694 (2020). We (like the government) read Gordon's second argument as, at root, a factual challenge and address it as such.

that the police are not effective at controlling Mara Salvatrucha, it is dispositive that they are trying to do so.").

Substantial evidence supports the immigration judge's finding that Gordon didn't establish that any torture would be inflicted or instigated by, or occur with the consent or acquiescence of, a person acting in an official capacity. First, Gordon's family has remained safe in Jamaica. Although Gordon's mother and brother lived in Jamaica both throughout his involvement with Bulla's organization—including when Hislop was murdered, when Gordon was convicted of drug offenses, and when he was released early from prison (for snitching, to Bulla's mind)—and since, neither was ever harmed by the Jamaican government (or the drug trafficking organization). Nor was Gayle. Although on one visit to Jamaica he was stopped (by unknown persons looking for Gordon), Gayle wasn't harmed at that time—and he has since returned repeatedly to Jamaica without being harmed.

Second, there's substantial record evidence that the Jamaican government has not tortured others associated with Bulla's organization. Edwin Murphy, who (unlike Gordon) did cooperate against the organization in exchange for early release from prison, now lives safely in Jamaica. Gordon admitted that Jaro Kelly wasn't murdered because of his affiliation with Gordon (or Hislop's death). And the news articles Gordon filed about the deaths of Hot Beer (who was "ambushed by a group of armed men") and Omar (killed in a drive-by shooting) suggest no government involvement.

Third, Gordon's own expert witness, Dr. Blake, admitted he'd "never really heard" of Jamaican government investment in a drug trafficking organization like Gordon described in his testimony.  Other record evidence weakens Gordon's assertion of ties between the Jamaican government and Bulla's organization too.  Gayle was run off the road by men looking for Gordon, and Bulla showed up at Gordon's father's funeral looking for him.  As the government suggested during Gordon's cross-examination, the fact that Bulla's organization needed to sideline Gordon's cousin—or drop in on a family gathering—to determine whether he was in-country calls into question the organization's relationship to customs officials.

Fourth, substantial record evidence supports the conclusion that the Jamaican government would not acquiesce to Gordon's torture and is instead taking steps to combat corruption and violence.  Dr. Blake testified to internal affairs-type investigations that root out corruption, if only with a two percent conviction rate.  His testimony is corroborated by numerous documentary evidence sources.  Gordon submitted a news article quoting Dr. Horace Chang, Jamaica's National Security Minister, declaring that "[w]hat we have to do" to combat drug dealers corrupting the legal system "is take steps to prevent it and mitigate the damage."  Gordon also filed a Jamaica Gleaner newspaper article reporting that "a number of independent bodies [have been] set up to investigate the police"—including INDECOM (the Independent Commission of Investigations), to which the Jamaican constabulary force's Anti-

Corruption Branch refers allegations of extrajudicial police shootings. Another article reported that INDECOM investigated 125 civilian fatalities resulting from police operations and forwarded its report on policy breaches to the police commissioner "to consider for appropriate actions." And a news article noted $1 billion in investment in "the new Integrity Commission" oversight body. Gordon also submitted articles discussing the criminal prosecution of 27 police officers following "an investigative commission probing allegations against police and soldiers" of "indiscriminate shootings and unlawful killings"—the articles reported a "reduction in police-involved killings since 2014," perhaps because of "fear among officers of [both] prosecution by an independent agency that now investigates abuse allegations against police" as well as of Special Coroner's Court inquests.

Most importantly, Gordon also filed the U.S. Department of State's 2019 and 2020 Human Rights Reports. The latter indicated that Jamaican law "provides criminal penalties for corruption by officials," albeit ineffectively implemented. Still, the report noted that Jamaica's former minister of education, youth, and information was charged with "several counts of corruption, conspiracy to defraud, and misconduct in a public office" following a scandal involving misuse of public funds. The State Department's 2020 report documented two police officers convicted and imprisoned (for six years and life, respectively) that year for unlawful killings—and noted "[n]umerous other cases, particularly the Clarendon 'Death Squad' trial, await[ing] prosecution." Not only was the agency

entitled to "rely heavily" on these State Department reports, *see Reyes-Sanchez*, 369 F.3d at 1243, but we've held that a government's attempts to combat violence or corruption—even if unsuccessful—are dispositive of the issue of acquiescence, *Sanchez-Castro*, 998 F.3d at 1288. In short, because substantial evidence shows that the Jamaican government is making efforts to fight corruption, we must conclude as a matter of law that it would not acquiesce in Gordon's torture.

We note that Gordon presented some evidence of police involvement in the deaths of Lassie and Rankin Bernard. Gordon testified that Lassie was killed in a police shootout, but we're bound to draw the reasonable inference in the agency's favor that Lassie—described by Gordon himself as a "known thief," "known gunman," and "troublemaker kid"—wasn't killed unlawfully. *See Lingeswaran*, 969 F.3d 1278 at 1286. As for Rankin Bernard, Gordon's declaration indicated only that he was killed by police while vacationing in Jamaica. With no facts suggesting otherwise, we must likewise infer that he wasn't killed unlawfully.

In sum, the record doesn't compel a finding that Gordon will more likely than not be tortured by, at the instigation of, or with the consent or acquiescence of a government official acting in an official capacity. *See Lopez*, 504 F.3d at 1344. And "[w]hen "the record could support or contradict the conclusion of the [board], we must affirm its decision." *Lingeswaran*, 969 F.3d 1278 at 1286 (quoting *Recinos v. U.S. Att'y Gen.*, 566 F.3d 965, 967 (11th Cir. 2009)). Because substantial evidence supports the immigration

judge's denial of Gordon's claim, we lack the authority to reverse the board's order affirming that decision.

Gordon makes two final arguments, but neither is availing. First, he argues that the immigration judge applied an incorrect legal standard by requiring Gordon to demonstrate a particular motivation for his likely torture, thereby adding an "extra element" to Gordon's claim. We find no support in the record for this assertion; both the immigration judge's decision and the board's order applied the correct legal standard, requiring Gordon to establish he would more likely than not be tortured if he returned to Jamaica. And to the extent the immigration judge explored the reasons behind the Tampa distributors' deaths during the hearings, the agency was entitled to probe the veracity of Gordon's claim that the organization wanted to harm him at all.

Second, Gordon says the immigration judge ignored evidence of Jamaica's history of extrajudicial killings of "social undesirables"—including drug traffickers like Gordon—and failed to appreciate the country conditions (namely, "the unique involvement of politics and government with organized crime and extrajudicial violence in Jamaica"). Gordon contends that, "[p]utting aside the more specific, individualized reasons why [he] faces an outsized risk of torture," evidence of his "membership in the group of social undesirables" satisfied his burden of proof.

We lack jurisdiction to consider this argument, however, because Gordon did not raise it before the board. *Cf.* 8 U.S.C. § 1252(d)(1); *Alim*, 446 F.3d at 1253–54. In his appellate brief before

the board, Gordon raised the "core issue" that the immigration judge erred by finding he hadn't shown he would more likely than not be tortured if removed to Jamaica, but he never raised the "discrete argument" that he would more than likely be tortured as a generalized "undesirable" in Jamaican society. *Cf. Jeune*, 810 F.3d at 800. Instead, Gordon argued he was "marked for death specifically and solely because of his involvement in a criminal organization *of which he subsequently ran afoul*." He relied entirely on the animosity of Bulla and his organization (with which "a wide variety of Jamaican officials were intimately involved") toward Gordon because of Hislop's death and the perception that Gordon had snitched—pointing to "the systematic murder of each of his former Florida-based associates" and the organization's threats to Gordon's family as among the reasons he feared facing torture in Jamaica. As a result, we lack jurisdiction to consider his argument that he also faced torture for his "membership in the group of social undesirables" and so dismiss his petition in that regard.

**PETITION DISMISSED IN PART, DENIED IN PART.**