**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————

No. 25-12447

Non-Argument Calendar

————————————

JASHIM UDDIN,

*Petitioner,*

*versus*

U.S. ATTORNEY GENERAL,

*Respondent.*

————————————

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A206-510-835

————————————

Before ROSENBAUM, GRANT, and ED CARNES, Circuit Judges.

PER CURIAM:

Jashim Uddin is a native and citizen of Bangladesh and is a member of the Bangladesh Nationalist Party (BNP). After being attacked by members of a rival political group, the Awami League

2                    Opinion of the Court                    25-12447

(League), he fled his home country for the United States. Upon arrival, he was detained by an immigration officer, after which he applied for asylum and withholding of removal, asserting persecution due to his political opinion. An immigration judge (IJ) denied his application, in part because he found that Uddin had "not convincingly demonstrated that the [Bangladeshi] government is unwilling or unable to protect him from private-actor [League] members." The Board of Immigration Appeals (BIA) affirmed. Uddin has petitioned for our review. His petition is denied.

## I.

Uddin fled his home country of Bangladesh and entered the United States on May 5, 2013, without valid entry documentation. In July 2013, he received a Notice to Appear, charging him as removable under the Immigration and Nationality Act. He conceded the charge of removability but then applied for asylum and withholding of removal in May 2014.[1] The IJ conducted a hearing, heard Uddin's testimony, and evaluated documentary evidence.

Uddin testified that he had lived with his parents in Bangladesh and worked as a farmer on his family's land. He testified that

---

[1] Uddin also submitted an application for withholding of removal under the Convention Against Torture (CAT), which the IJ denied. He did not appeal that decision to the BIA, nor to this Court, and we do not consider it. *See Laguna Rivera v. U.S. Att'y Gen.*, 130 F.4th 915, 925 (11th Cir. 2025) (explaining that "we cannot consider claims that have not been raised before the BIA . . . because the exhaustion requirement found in 8 U.S.C. § 1252(d)(1) precludes review of a claim that was not presented to the BIA") (quotation marks and citation omitted).

he had been a member of the BNP since 2007 and was chosen to serve as a president for a youth chapter of his union in 2009. As a youth chapter president, he'd delegate tasks, raise money, and organize rallies. And he estimated that he'd recruited around 200 people to join the BNP between 2007 and 2013.

Uddin also testified that the League was the current political party in power, and he believed it was responsible for threats to the life of the current BNP leader. As a president of a youth chapter in the BNP, Uddin felt threatened by the League. And on one occasion, on October 28, 2012, he was approached by five League members whom he recognized from political rallies, and they pressured him to join their party. When he refused, they assaulted him by hitting him with hockey sticks and punching and kicking him. This went on for about two minutes until he screamed and people began gathering around, so the League members ran away. Uddin did not know his attackers' names. And he did not report the attack to the police because BNP leaders had always told him if he filed a report with the police "they're not going to listen . . . because they are [] people of the Awami League[;] . . . they're going to . . . kill you, . . . so . . . it's better not to" report.

Uddin explained that he remained the president for his BNP youth chapter after the attack but that League members came looking for him at his home. And he hid in his room so that the League members would believe he wasn't there. He testified that he left Bangladesh "to save [his] life," and after leaving Bangladesh in January 2013, League members continued to visit his home looking

for him, and sometimes between eight and twelve members showed up at once.

According to Uddin, after he left Bangladesh some League members went to his parents' home and told his parents that they would "definitely find [Uddin] and [they were] going to kill him." The League members also told his parents that if they couldn't locate him, they'd harm them instead. Despite these threats, Uddin's parents continued to reside in the same home after Uddin left the country, though sometimes they spent the night with other family members if "the situation [was] bad."

In addition to Uddin's testimony, the IJ reviewed documentary evidence, including several news articles discussing Bangladesh's "lawlessness and civil strife" due to the "wanton acts of violence" by both the League and BNP, *see generally Sepulveda v. United States Att'y Gen.,* 401 F.3d 1226, 1231–32, 1232 n.7 (11th Cir. 2005) (explaining that reports of generalized violence are insufficient to show that a petitioner will be "singled out for persecution" in his home country and presenting such reports without more "is fatal to [an] asylum claim") (emphasis omitted); country reports prepared by the Department of State; a Congressional Research Service report; and an Odhikar Report on human rights from 2015.

The IJ concluded that the record contained some evidence that "it would be difficult for BNP members to rely on a [League-led] government for protection." But he also concluded that the evidence "indicate[d] that [League] members do not act with total

impunity." The IJ pointed to evidence of League members and corrupt police officers being arrested. And he highlighted a 2015 State Department country report showing that the Bangladeshi government had taken "steps to address widespread police corruption" and that the government did not "prosecute individuals solely for political reasons." *See generally Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004) (explaining that the BIA may "rely heavily" on State Department reports).

In light of the evidence, the IJ was not convinced that "any efforts [Uddin] would have made to report the threats or attack to the police would have been futile or 'useless.'" While the record showed that Uddin's attackers were League members, the IJ found that they were acting in a "private capacity," and there was nothing to show that they were acting on behalf of the Bangladeshi government when they attacked him. And the IJ concluded that Uddin had "not convincingly demonstrated that the government is unwilling or unable to protect him from private-actor [League] members."

The BIA accepted the IJ's finding that Uddin had failed to show that the Bangladeshi government "was and will be unable or unwilling to protect" him. [2] It also adopted the IJ's reasoning and

---

[2] The IJ made other findings and conclusions, such as finding that Uddin was "not [a] credible" witness. And while the BIA noted that Uddin had raised several arguments related to the IJ's adverse credibility finding, the BIA based its decision solely on the IJ's "alternative merits analysis[, which] presume[d] that [Uddin] was credible and largely turn[ed] on country condition evidence." Because we review the IJ's decision only to the extent that the BIA

determined that the IJ had appropriately weighed a "mixed eviden-tiary record." The BIA dismissed Uddin's appeal, after which he timely petitioned our Court for review.

## II.

"We review the decision of the [BIA], and we review the de-cision of the [IJ] to the extent that the [BIA] expressly adopted the opinion of the [IJ]." *Kazemzadeh*, 577 F.3d at 1350 (quotation marks omitted). We review *de novo* the BIA and IJ's conclusions of law, but review findings of fact only to determine whether substantial evidence supports them. *Id.*

"Our review for substantial evidence is highly deferential." *Id.* at 1351. Under this standard of review, "we view the record ev-idence in the light most favorable to the [BIA]'s decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ash-croft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). "We must af-firm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotation marks omitted); *see also Kazemzadeh*, 577 F.3d at 1351 ("We may not re-weigh the evidence from scratch.") (quotation marks omitted).

---

adopted it, *see Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009), we don't consider any other finding of the IJ's, *see Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007) (declining to address petitioner's challenge to an IJ's finding where the finding had not been adopted by the BIA and therefore did not form part of the order under review).

To reverse the BIA's factual findings, "we must find that the record not only supports reversal, but compels it." *Kazemzadeh*, 577 F.3d at 1351 (quotation marks omitted); *see* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); *see also Kazemzadeh*, 577 F.3d at 1351 ("The mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.") (alteration adopted and quotation marks omitted); *Mazariegos v. U.S. Att'y Gen.*, 241 F.3d 1320, 1323–24 (11th Cir. 2001) ("[A] denial of asylum may be reversed *only* if the evidence presented by the applicant is so powerful that a reasonable factfinder would *have* to conclude that the requisite fear of persecution exists."). "Our inquiry is whether there is substantial evidence for the findings made by the BIA, *not* whether there is substantial evidence for some *other* finding that could have been, but was not, made." *Mazariegos*, 241 F.3d at 1324.

### III.

Uddin contends that the IJ and BIA erred in determining "that the record supported a conclusion that the [Bangladeshi] government and the Awami League actors were not one [and] the same and that the [Bangladeshi] government was willing and able to protect" him. He contends that the "record is replete with numerous examples showing that the [Bangladeshi] government allows the Awami League members to persecute political opponents with impunity," and therefore, the BIA's determination that the record is "mixed on th[at] point" is unsupported by the record. Thus,

he contends that the BIA's determination is "not supported by substantial evidence," and "the record compels reversal."

Among other things, to be eligible for asylum, an applicant must prove that he "is unable to avail [him]self of the protection of [his] home country." *Lopez*, 504 F.3d at 1345; 8 U.S.C. § 1158(b)(1)(A)–(B). "[T]he failure to report persecution to local government authorities generally is fatal to an asylum claim." *Lopez*, 504 F.3d at 1345. But if an applicant "convincingly demonstrates" that he "could not rely on" the local authorities because "those authorities would have been unable or unwilling to protect" him, a failure to report is "excused." *Id.* To be excused from reporting persecution, however, the applicant must show that he was persecuted by the government or private actors that the government is unwilling or unable to control. *See Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 950–51 (11th Cir. 2010).

Substantial evidence supports the IJ and BIA's finding that Uddin's attackers were private parties.[3] While Uddin testified that he knew his attackers were affiliated with the League, the record contains no evidence that his attackers were employees of the League or working for the government.[4]

---

[3] "Because [Uddin] has failed to establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of removal[.]" *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1288 n.4 (11th Cir. 2005).

[4] In his initial brief, Uddin asserts that his attackers "were acting at the direct or implicit direction of the [Bangladeshi] government." But he provides

25-12447                Opinion of the Court                9

And without evidence of government actors being Uddin's attackers, the record needed to have supported that the Bangladeshi government was unwilling or unable to control the private, League-member actors who attacked him. *See Ayala*, 605 F.3d at 950–51. While the record contains evidence on both sides of the scale, the IJ and the BIA weighed that evidence, and "we may not re-weigh" it. *Kazemzadeh*, 577 F.3d at 1351. As the IJ recognized, evidence showed that there was political violence in Bangladesh: BNP members were subjected to arrests and violence at the hands of the League and police, and the Bangladeshi government sometimes failed to comprehensively investigate such cases. But the IJ pointed out that the evidence, including the country reports, also showed that the government had implemented training and review mechanisms and prosecuted League members and members of the police for crimes and human rights abuses. *See Mazariegos*, 241 F.3d at 1324; *see also Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1234 (11th Cir. 2018) (explaining that "the failure to make an arrest does not prove that the police did not investigate" an incident and an IJ is "entitled to rely on the country reports to find that the . . . authorities have been increasingly responsive to threats").

---

no record citation to support this assertion. *See* Fed. R. App. P. 28(a)(8)(A) (explaining that an appellant must include "citations to the authorities and parts of the record on which the appellant relies"); *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) (explaining that it is not the Court's job to "cull the record"). And in our review of the record, we have found nothing to support that assertion either.

The record does not compel reversal — substantial evidence supports the IJ and BIA's conclusion that Uddin's attackers were private actors and that Uddin failed to establish that the Bangladeshi government was unable or unwilling to protect him from them. *See Mazariegos*, 241 F.3d at 1324. Because the evidence that Uddin presented is not "so powerful that a reasonable factfinder would *have* to conclude that the requisite fear of persecution exists," we must affirm the BIA's decision. *Id.* at 1323–24; 8 U.S.C. § 1252(b)(4)(B); *Adefemi*, 386 F.3d at 1027.

**PETITION DENIED.**